611 F.Supp. 1396 (1985)
In re "AGENT ORANGE" PRODUCT LIABILITY LITIGATION,
Michael F. RYAN, et al., Plaintiffs,
v.
DOW CHEMICAL COMPANY, et al., Defendants.
MDL No. 381, 79-C-747.
United States District Court, E.D. New York.
May 28, 1985.
*1397 *1398 Stephen J. Schlegel, Schlegel & Trafelet, Ltd., Chicago, Ill.; Thomas Henderson, Henderson & Goldberg, Pittsburgh, Pa.; Phillip E. Brown, Hoberg, Finger, Brown, Cox & Molligan, San Francisco, Cal.; Stanley Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, Ohio; John Q. O'Quinn, O'Quinn and Hagans, Houston, Tex.; Neil R. Peterson and Gene Locks, Greitzer & Locks, Philadelphia, Pa.; Newton B. Schwartz, Houston, Tex.; Irving Like, Reilly, Like & Schneider, Babylon, N.Y.; David J. Dean, Dean, Falanga & Rose, Carle Place, N.Y.; Aaron Twerski, Hempstead, N.Y., of counsel, for plaintiffs.
Leonard Rivkin, Rivkin, Leff, Sherman & Radler, Garden City, N.Y.; Philip Pakula, Townley & Updike, New York City; Wendell B. Alcorn, Jr., Cadwalader, Wickersham & Taft, New York City; William Krohley, Kelley, Drye & Warren, New York City; Thomas Beck, Arthur, Dry & Kalish, New York City; Bruce Hecker, Shea & Gould, New York City, of counsel; David R. Gross, Budd, Larner, Kent, Gross, Picillo & Rosenbaum, New York City; Paul V. Esposito, Lewis, Overbeck & Furman, Chicago, Ill.; Henry G. Miller, Clark, Gagliardi & Miller, White Plains, N.Y., for defendants.
*1399 Arvin Maskin, Dept. of Justice, Washington, D.C., for third-party defendant U.S.

MEMORANDUM, ORDER AND JUDGMENT ON DISTRIBUTION OF THE SETTLEMENT FUND
WEINSTEIN, Chief Judge.

TABLE OF CONTENTS
 I. INTRODUCTON ........................................... 1399
 II. LEGAL STANDARDS FOR FUND DISTRIBUTION 1402
 III. COMPARISON OF VARIOUS PROPOSALS FOR
 DISTRIBUTION .......................................... 1403
 A. Postpone Distribution Until the United States
 Has Accepted its Responsibility .................... 1403
 B. Further Research ................................... 1406
 C. Medical Treatment and Health Care Services ......... 1406
 D. High Compensation for Specific Diseases ............ 1407
 E. Death and Disability Payment Program and
 Class Assistance Foundation ........................ 1410
 IV. PAYMENTS FOR DEATH AND TOTAL
 DIABILITY OF EXPOSED VETERANS ......................... 1410
 A. Compensable Death or Disability .................... 1412
 B. Determining Total Disability ....................... 1412
 C. Proof of Death and Eligible Survivorship ........... 1413
 D. Exposure ........................................... 1414
 E. Payment Program Time Limits ........................ 1417
 F. Structure and Amount of Disability and Death
 Benefits ........................................... 1417
 1. Disability Benefit .............................. 1418
 a. Variation in Award Based on Age and
 Year of Occurrence ........................... 1418
 b. Onset of Disability and Payment for Past
 Disability ................................... 1419
 c. Termination of Payment ....................... 1420
 d. Other Criteria for Calculating Payment ....... 1420
 2. Death Benefit ................................... 1420
 3. Variation in Awards Depending on Number of
 Subsequent Claims ............................... 1421
 a. Disability Payments .......................... 1421
 b. Death Payments ............................... 1422
 c. Lump Sum Versus Installment Payments ......... 1422
 4. Amounts Payable ................................. 1422
 5. Disbursements of Any Excess Remaining at
 Program Termination ............................. 1423
 G. Means Test and Impact of Payment on Public
 and Private Assistance ............................. 1423
 H. Implementation and Operation of the Payment
 Program ............................................ 1427
 1. Administration by Private Contractors ........... 1427
 2. Preparation of Application Forms ................ 1427
 3. Distribution and Return of Applications ......... 1428
 4. Processing and Appeals .......................... 1428
 5. Benefit Calculation and Adoption of Final
 Payment Levels .................................. 1429
 6. Annual Reviews and Continuing Eligibility
 Reviews ......................................... 1429
 7. Court Control and Reports to the Court .......... 1429
 8. Veterans Advisory Group ......................... 1430
 I. Private Attorney Fee Arrangements .................. 1430
 V. CLASS ASSISTANCE FOUNDATION ........................... 1431
 A. General Framework .................................. 1432
 1. Funding Priorities .............................. 1432
 2. Funding Structure ............................... 1432
 3. Persons Who Should Receive Services ............. 1433
 B. Governance ......................................... 1434
 1. Tax Exempt Status and Organzation in
 Perpetuity ...................................... 1434
 2. Board of Directors .............................. 1434
 3. Executive Director .............................. 1435
 C. Funding and Disbursements .......................... 1435
 1. Court Supervision of Disbursement ............... 1435
 2. Rate of Payout and Future Needs ................. 1436
 3. Indemnity Reserve and Payout of Balance of
 Endowment Remaining After Twenty-Five
 Years ........................................... 1437
 D. Mandates and Goals in Funding Services ............. 1437
 1. Possibilities for Funding of Birth Defect and
 Reproductive Problem Programs ................... 1438
 a. Maximizing Access to Existing Services
 and Provision of Family Support Programs ..... 1438
 b. Additional Projects and Emergency
 Financing for Medical Services ............... 1439
 c. Reproductive Problems and Genetic
 Counseling ................................... 1439
 2. Possibilities for Funding of Classwide Services 1440
 a. National Vietnam Veterans Advocacy
 Center ....................................... 1440
 b. National Hotline and Referral Service,
 Agent Orange Information Clearinghouse,
 and Public Information Programs .............. 1441
 c. Other Projects ............................... 1441
 E. Grant and Contract Procedures ...................... 1441
 1. Development of Specific Funding Priorities ...... 1441
 2. Grant Application and Review Process ............ 1441
 a. Open and Competitive Bidding ................. 1442
 b. Review of Bids and Monitoring of Ongoing
 Projects ..................................... 1442
 3. Service Suppliers Represented on the Board of
 Directors ....................................... 1442
 F. Fundraising ........................................ 1442
 1. Matching Grants, Joint Ventures and Similar
 Devices ......................................... 1443
 2. Charitable Contributions ........................ 1443
 VI. AUSTRALIAN AND NEW ZEALAND
 CLAIMANTS ............................................. 1443
 VII. IMPLEMENTATION AND OPERATION OF THE
 DISTRIBUTION PLAN ..................................... 1445
 A. Communications with the Class ...................... 1445
 1. Publication of the Terms of the Plan ............ 1445
 2. Periodic Notice About the Operation of the
 Plan ............................................ 1446
 3. Mailing to Prospective Payment Program
 Claimants ....................................... 1446
 4. Coordinated Mailings by the Class Assistance
 Foundation ...................................... 1447
 5. Assistance for Claimants in Filling Out Forms 1447
 B. Overall Structure and Financial Matters ............ 1448
 1. Minimizing Adverse Tax Consequences ............. 1448
 2. Investment ...................................... 1448
 3. Administrative Budgets .......................... 1449
 4. Audits .......................................... 1449
 C. Role of the Special Master and Implementation
 Schedules .......................................... 1450
 1. Payment Program ................................. 1451
 2. Class Assistance Foundation ..................... 1451
 3. Annual Operating Schedules ...................... 1451
VIII. CONCLUSION ............................................ 1451

I. INTRODUCTION
On May 7, 1984, a settlement was reached in this class action by Vietnam veterans and their family members against seven chemical companies for injuries plaintiffs believed were caused by exposure of *1400 the veterans to Agent Orange and other phenoxy herbicides in Vietnam. The settlement has been found, under the circumstances, to be fair, reasonable and adequate; the reasonable fees and expenses to be paid from the settlement fund to plaintiffs' attorneys have been determined; and final approval has been given to the settlement. See, e.g., In re "Agent Orange" Product Liability Litigation, 611 F.Supp. 1296 (E.D.N.Y.1985) (Memorandum and Order on Attorney Fees and Final Judgment); 597 F.Supp. 740 (Preliminary Memorandum and Order on Settlement); 611 F.Supp. 1285 (E.D.N.Y.1985) (Memorandum, Order and Judgment dismissing chemical companies' third-party claims against the United States); 611 F.Supp. 1223 (E.D.N.Y.1985) (Memorandum, Order and Judgment dismissing the actions of 281 veterans who opted out of the class action against the chemical companies); 104 F.R.D. 559 (E.D. N.Y.1985) (Memorandum and Order lifting protective orders with stay pending disposition of appeals); 603 F.Supp. 239 (E.D.N.Y. 1985) (Memorandum, Order and Judgment dismissing plaintiffs' claims against the United States); 597 F.Supp. at 876-78 (listing all previously published opinions).
The issue now posed is how to distribute the balance of the settlement fund  some $200 million  remaining after payment of attorney fees and expenses. There is no entirely satisfactory answer to the distribution problem. The definition of the class gives guidance only insofar as it requires two conditions for an award to any individual: (1) exposure to Agent Orange in Vietnam, and (2) a claim of injury as a result of that exposure. Because no substantial scientific evidence supports a finding of causal connection between Agent Orange exposure and any specific disease except chloracne, and because of the near impossibility of proving that any particular plaintiff's condition was caused by Agent Orange, dividing the fund among those with particular diseases is unjustified. Dividing the fund equally among all of those who might now or in the future meet the two requirements  exposure and injury  has the appeal of simplicity, but the individual sums allocated would be too small to provide an appreciable benefit to the recipient.
A number of other suggestions are discussed below. None has as much merit as that proposed by Special Master Kenneth R. Feinberg, Esq. In an elegant solution, he suggests a combination of insurance-type compensation to give as much help as possible to individuals who, in general, are most in need of assistance, together with a foundation run by veterans with the flexibility and discretion to take care of individuals and groups most in need of help. With some slight modifications, the Special Master's recommendations are adopted. The Special Master will be reappointed to oversee implementation of the distribution plan.
The greater part of the fund will be distributed through a payment program to individual veterans and family members in the form of death and disability benefits. Another portion will be allocated to a class assistance foundation to be administered for the benefit of the class as a whole, including the spouses and children of veterans. Finally, two percent of the fund will be allocated if trusts can be established in Australia and New Zealand for disbursement to class members in those countries.
In essence, an insurance policy for death and disability during the period from 1970 to 1995 will be purchased for $150 million covering each of an estimated 600,000 United States Vietnam veterans exposed to Agent Orange. In addition, a foundation initially funded at $45 million will be organized to provide services to exposed veterans and their families, particularly those with children having birth defects.
Actual distribution cannot begin until appeals are decided. The first of these appeals was filed early this year and the last of them probably will not be decided until 1986. Nevertheless, to speed disposition as much as possible, the Special Master is being directed to take all necessary steps to enter into the requisite contracts, set up the necessary organizations, and receive applications for awards so that payments *1401 can be made promptly should the appellate courts approve. Payments to members of the class necessarily will be stayed pending the final decisions on appeal.
Recovery is limited by the definition of the class certified. It consists of certain Vietnam veterans and their family members:
The plaintiff class is defined as those persons who were in the United States, New Zealand or Australian Armed Forces at any time from 1961 to 1972 who were injured while in or near Vietnam by exposure to Agent Orange or other phenoxy herbicides, including those composed in whole or in part of 2, 4, 5-trichlorophenoxy-acetic acid or containing some amount of 2, 3, 7, 8-tetrachlorodibenzo-p-dioxin. The class also includes spouses, parents, and children of the veterans born before January 1, 1984, directly or derivatively injured as a result of the exposure.
In re "Agent Orange" Product Liability Litigation, 100 F.R.D. 718, 729 (E.D.N.Y. 1983), mandamus denied, 725 F.2d 858 (2d Cir.), cert. denied, ___ U.S. ___, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984) (emphasis added). The term "Agent Orange" as used in this and earlier opinions refers to other phenoxy herbicidesAgent Orange II, Agent Purple, Agent Pink and Agent Greenas well as Agent Orange. The settlement covers the claims of all class members. See In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 862-66 (E.D.N.Y.1984) (reprinting settlement agreement).
Distribution of preliminary claim forms began in June 1984. Class members wishing to participate in distribution of the settlement fund were required to submit claim forms by the filing deadline if the injuries believed to be related to Agent Orange exposure had already become manifest. Those who later learn of adverse health effects previously unknown to them are required to file claims within 120 days of acquiring that knowledge.
The original filing deadline of October 26, 1984 was extended twice at the request of various veterans groups. The final deadline required claim forms to be delivered or postmarked by January 15, 1985. Special provision was made for veterans whose names were on a list provided by the Veterans Administration in December 1984. A postcard was mailed to each of these individuals with instructions to sign and return it if that person had not previously received a claim form; once a claim form had been mailed, that individual had 30 days to complete and return it. Similarly, a person who wrote or called requesting a claim form by January 2, 1985 was given 30 days to complete and return a claim form once one had been mailed to that individual.
To date, about 245,000 claims have been filed with the Agent Orange Computer Center, the facility that has been processing claim forms under court supervision. About 12,000 of them were filed after the applicable deadline.
A significantly higher number of claims has been received than was originally anticipated. The aggregate number of claims submitted, however, has little bearing on the question of how many claims have any merit. Many claims appear to have been submitted because various organizations have advised veterans to file claims whether or not anything was wrong with them and whether or not any problems they may have could conceivably be related to Agent Orange exposure. See Memorandum of Agent Orange Plaintiffs' Management Committee in Opposition to Report of the Special Master Pertaining to the Disposition of the Settlement Fund, filed May 7, 1985, pp. 7, 14.
The $180 million settlement fund has been accruing interest since the date of settlement and now totals over $195 million. On January 7, 1985, attorney fees and expenses amounting to about $9.3 million were awarded. This award has not been paid pending appeals. Motions for reconsideration of a number of these fee awards are presently pending before the Magistrate. The portion of the settlement fund available for distribution now amounts to about $185 million, a figure *1402 subject to adjustment when the final decision on reconsideration of attorney fee awards is made. A total of about $200 million should be available for distribution to the class once appeals have been completed.
Following the public hearing on distribution held on March 5, 1985, the court received a number of submissions that required thorough review. The Agent Orange Plaintiffs' Management Committee had requested and were granted additional time to address the merits of the plan submitted by Special Master Kenneth R. Feinberg. Their comments were forwarded to the court on May 6, 1985. Individual letters from veterans organizations and members of the class received by May 15, 1985 were all considered by the court. The numerous distribution proposals, extensive testimony and other commentary on various proposals all were evaluated carefully in reaching a decision on which plan was most practicable and fair.

II. LEGAL STANDARDS FOR FUND DISTRIBUTION
The court's responsibility for ensuring that a satisfactory and equitable distribution plan is implemented derives from the requirement that settlement of a class action have court approval. Fed.R. Civ.P. 23(e); see, e.g., Curtiss-Wright Corp. v. Helfand, 687 F.2d 171, 173-75 (7th Cir.1982); Beecher v. Able, 575 F.2d 1010, 1016 (2d Cir.1978). "Until the fund created by the settlement is actually distributed, the court retains its traditional equity powers." Zients v. Lamorte, 459 F.2d 628, 630 (2d Cir.1972). The Rule 23(e) standard of fairness, adequacy, and reasonableness "applies with as much force to the review of the allocation [plan] as it does to the review of the overall settlement between plaintiffs and defendants." In re Chicken Antitrust Litigation American Poultry, 669 F.2d 228, 238 (5th Cir.1982). So long as there is no "abuse of discretion," the district court's decision on distribution details is binding. See, e.g., In re Equity Funding Corp. of America Securities Litigation, 603 F.2d 1353, 1362, 1365 (9th Cir.1979); West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079, 1085 (2d Cir.), cert. denied sub nom. Cotler Drugs, Inc. v. Chas. Pfizer & Co., Inc., 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). The broad general powers of the court are enhanced in this case by the settlement agreement itself granting the court "continuous jurisdiction, control and supervision" of the fund. In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 864 (E.D.N.Y.1984). See Curtiss-Wright Corp. v. Helfand, 687 F.2d 171, 173 (7th Cir. 1982).
This is a diversity tort class action. A class member's substantive right to recover for personal injuries arises under state law rather than federal law. In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 799-816 (E.D.N.Y. 1984) (conflict of laws and statutes of limitations); 580 F.Supp. 690 (E.D.N.Y.1984) (general discussion of conflict of laws). In approving a distribution plan in such an action pursuant to Rule 23(e), care must be exercised to see that the plan is consistent with substantive rights to damages governed by state law. See 28 U.S.C. § 2072 (Rules Enabling Act); 28 U.S.C. § 1652 (Rules of Decision Act).
Traditionally, a tort plaintiff's entitlement to damages requires a particularized showing of individual causation and injuries. Faithfulness to traditional tort rules in disbursing a class action settlement fund thus would require "the court to weigh the strengths and weaknesses of the claims of each class member against each of the settling defendants," a truly herculean task, "rendered a practical impossibility [if] * * the settling defendants agreed to and did participate only in a joint settlement wherein the breakdown of the contribution from each of the individual defendants was not disclosed." In re Equity Funding Corp. of America Securities Litigation, 603 F.2d 1353, 1365 (9th Cir.1979). Moreover, in the case of Agent Orange implementation of any distribution plan based on traditional tort principles is impossible because of a virtual absence of proof of causation, financially impracticable because of administrative *1403 costs, and not feasible for other compelling reasons. See infra Part III.
Under such circumstances, the consensus of state law, see In re "Agent Orange" Products Liability Litigation, 580 F.Supp. 690 (E.D.N.Y.1984), undoubtedly would permit alternative methods of disbursement to be considered in undertaking "the almost impossible task of determining the distribution of the settlement fund among the myriad claimants." In re Equity Funding Corp. of America Securities Litigation, 603 F.2d 1353, 1365 (9th Cir.1979).
Alternative methods of distributing a settlement fund may be premised on a rationale similar to the cy pres doctrine of testamentary interpretation. See West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079, 1085-91 (2d Cir.), cert. denied sub nom. Cotler Drugs, Inc. v. Chas. Pfizer & Co., Inc., 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); In re Folding Carton Antitrust Litigation, 557 F.Supp. 1091, 1108-09 (N.D.Ill.1983), aff'd in pertinent part, 744 F.2d 1252, 1254 (7th Cir.1984), cert. dismissed, 53 U.S.L.W. 3854 (U.S. May 17, 1985) (No. 84-1266). Since the settlement agreement does not provide for automatic reversion of any portion of the settlement fund except on disapproval of the settlement, there is no basis for objecting to the mode of fund allocation among the plaintiffs on the ground that the court lacks cy pres authority. See Beecher v. Able, 575 F.2d 1010, 1016 n. 3 (2d Cir.1978) (distinguishing fluid class recovery holding of Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (2d Cir.1973), vacated and remanded on other grounds, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)).

III. COMPARISON OF VARIOUS PROPOSALS FOR DISTRIBUTION
A number of general principles and specific suggestions for distribution were put forward at the 1984 Fairness Hearings. See In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 858-61 (E.D.N.Y.1984). Helpful comments also were made at the March 5, 1985 hearing on proposals for a distribution plan and in many written submissions to the court. Among general criteria proposed were that a simple and easily administered benefits program should be implemented, simple eligibility criteria should be developed to the extent possible, transaction costs such as attorney and expert fees and administrative overhead should be minimized, those veterans who most needed help should be given the most assistance, a national center for assisting Vietnam veterans should be established, and a fund should be set aside to help children with birth defects. These suggestions have been given substantial weight in developing this distribution order. The various distribution proposals submitted to the court will be described and analyzed below.

A. Postpone Distribution Until the United States Has Accepted its Responsibility

There is a strong body of opinion among the veterans that a considerably larger fund is required. While this view obviously has merit, no further funds are available from the defendant chemical companies. See In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740 (E.D.N.Y. 1984) (opinion on fairness of settlement).
A strong argument has been made by many veterans that the United States should participate in the settlement. The facts developed to date strongly support the view that the government knew or should have known of the dangers involved in the use of Agent Orange and that the government made a calculatedand perhaps justifiablechoice to use the chemicals in order to save the lives of many members of the armed forces and perhaps civilians by making it easier to deal with ambushes from jungle and brush hiding places. The government has refused to discuss settlement and it cannot be held liable as the law has been interpreted. See 597 F.Supp. at 879; 603 F.Supp. 239 (E.D. N.Y.1985) (dismissing individual actions against government); 611 F.Supp. 1221 (E.D.N.Y.1985) (dismissing third-party actions against government).
*1404 The government should not, however, refuse to cooperate with the Special Master and others in implementation of the distribution plan. Such cooperation could include access to experts, help in obtaining and interpreting military records, and assistance in coordination with benefit and social service programs. The Social Security Administration and personnel of other government agencies have already been helpful in the process of fashioning a distribution plan.
By passing legislation providing for possible compensation of veterans for Agent Orange exposure, Congress in effect has promised to make adequate compensation available should there be established at any time in the future a satisfactory scientific basis for finding a causal link between Agent Orange exposure and any medical problems from which Vietnam veterans suffer. See Veterans' Dioxin and Radiation Exposure Compensation Standards Act, Pub.L. 98-542, 98 Stat. 2725 (1984). The Act states that "[t]here is some evidence that chloracne, porphyria cutanea tarda, and soft tissue sarcoma are associated with exposure to certain levels of dioxin as found in some herbicides * * *." Id. § 2(5), 98 Stat. 2725. It establishes a presumption of causation for chloracne, a skin rash, and porphyria cutanea tarda (PCT), a liver disorder, if either of those diseases became manifest within one year of a veteran's departure from Vietnam. In the absence of evidence overcoming the presumption, interim death or disability benefits are payable for the period from October 1, 1984 to September 30, 1986. See id. § 9, 98 Stat. 2732; H.R.Rep. No. 592, 98 Cong., 2d Sess. 10-11, reprinted in 1984 U.S.Code Cong. & Ad.News 4449, 4457; Explanatory Statement of House Bill, Senate Amendment, and Compromise Amendment, 98th Cong., 2d Sess., 130 Cong.Rec. H11161 (daily ed. Oct. 3, 1984), reprinted in 1984 U.S.Code Cong. & Ad.News 4470, 4477-78.
The Administrator of Veterans' Affairs will appoint a Veterans' Advisory Committee on Environmental Hazards, an eight-member panel of which will evaluate scientific studies on the connection between dioxin exposure and adverse health effects. Act § 6, 98 Stat. 2729-30. For diseases other than chloracne, PCT and soft tissue sarcoma, the Administrator after considering the panel's advice will determine whether or not "there is sound scientific or medical evidence" of a causal connection to exposure to dioxin-contaminated herbicides. Id. § 5(b)(2)(B), 98 Stat. 2728. For all diseases meeting this threshold and for chloracne, PCT and soft tissue sarcoma, the Administrator in prescribing regulations for the resolution of claims for benefits will make determinations "based on sound medical and scientific evidence" about whether service connection will be granted in the adjudication of individual cases, specifying the factors to be considered in and circumstances governing the granting of service connection. Id. § 5(b)(2)(A), (3), 98 Stat. 2728-29.
On April 22, 1985, the Veterans Administration issued proposed regulations to implement the Act. See 50 Fed.Reg. 15,848-55 (1985) (to be codified at 38 C.F.R. §§ 1.17, 3.102, 3.311a-3.311b, 3.813). The rules establish a formal procedure for evaluating scientific or medical studies on the connection between dioxin exposure and adverse health effects. They also fulfill the statutory requirement that the VA issue rules specifying whether and under what circumstances chloracne, PCT and soft tissue sarcomas will be recognized as service-connected.
Proposed section 1.17 provides that, from time to time, the Administrator will publish evaluations of scientific or medical studies on causation in the Federal Register. It also states that the factors that will be considered in evaluating a study include (1) statistical significance and replicability of the study's findings, (2) whether the study and its findings have withstood peer review, (3) whether methodology is sufficiently described to permit replication, (4) whether the findings are applicable to veterans exposed to dioxin, and (5) the views of the appropriate panel of the Veterans' Advisory Committee on Environmental Hazards. 50 Fed.Reg. 15,852 (to be codified at 38 C.F.R. § 1.17).
*1405 Proposed section 3.311a addresses the connection between dioxin exposure in Vietnam and specified diseases. It presumes exposure for any veteran who served in Vietnam during the Vietnam era, and provides that the date of the veteran's exposure will be considered to be the date of the veteran's latest departure from Vietnam. 50 Fed.Reg. 15,853 (to be codified at 38 C.F.R. § 3.311a(4)(b)).
Service connection for resulting disability will be granted for chloracne manifested not later than three months from the date of exposure, id. (to be codified at 38 C.F.R. § 3.311a(4)(c)), absent a supervening cause. Id. (to be codified at 38 C.F.R. § 3.311a(4)(e)). No other diseases will be considered service-connected, because "[s]ound scientific and medical evidence does not establish a cause and effect relationship between dioxin exposure and [any other disease]." Id. (to be codified at 38 C.F.R. § 3.311a(4)(d)). Service connection, however, may be granted for a disease shown to have been incurred in or aggravated by active service. Id. (to be codified at 38 C.F.R. § 3.311a(4)(g)). Interim benefits will be available for chloracne or PCT that became manifest within one year after the date of the veteran's most recent departure from Vietnam, under the statutory presumption of causation. 50 Fed.Reg. 15,854-55 (to be codified at 38 C.F.R. § 3.813).
The absence of a sound scientific basis for finding causation and service connection for diseases other than chloracne under section 5 of the Act, and the narrow scope of presumed causation for certain diseases under section 9 of the Act, suggest that few if any veterans are currently eligible for disability benefits under the Act. No cases have yet been certified as warranting a disability finding for the purpose of receiving benefits. Letter from Arvin Maskin, Trial Attorney, Torts Branch, Civil Division, United States Department of Justice, dated May 15, 1985. Should further studies reveal some link between dioxin exposure and the veterans' medical problems, the procedure set up to add diseases to the list of those presumptively considered causally connected is designed to give adequate protection to the veterans.
Unfortunately, the Act did not take into account the widespread fears of genetic and other damage to the veterans' wives and children resulting from the veterans' exposure to Agent Orange in Vietnam. No substantial showing of causation has yet been made for this category of medical problems, but it undoubtedly would ease the tensions and fears among the veterans and their families if Congress were to expand the scope of the Act to include damage to the veterans' wives and children. Cf. In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 853-54 (1984) (discussing limited Veterans Administration benefits currently payable to spouses and children of veterans). If use of the VA as a compensation mechanism were deemed undesirable for administrative reasons, the Advisory Committee panel could report directly to Congress and direct legislative action could be taken on their findings as appropriate. Given the current state of scientific knowledge on causation, the potential cost to the government of making such compensation available would be negligible, while the benefit in terms of a sense of security and the assurance that the government really does care would be enormous. The Special Master is directed to bring this matter of possible amendment of the Veterans' Dioxin and Radiation Exposure Compensation Standards Act to the attention of appropriate legislative and executive bodies. He shall not, however, lobby in any way on this or other matters connected with the Agent Orange litigation. Lobbying activities would be inconsistent with his judicial role.
So far as a distribution plan is concerned, it clearly is not possible to wait for the government and others to make further funds and resources available. We are dealing with a scarce resource. Many class members have immediate needs, and much of the value of a settlement lies in the ability to make funds available promptly. The hard choices that must be made in *1406 distribution must be made by the court now.

B. Further Research

It is a position of some veterans that further extensive research to determine causation should be undertaken financed by the monies available from the fund. They would hold distribution in abeyance pending completion of such research. This expenditure is not warranted. The government has completed and has under way studies costing approximately $150,000,000. There is no reason to believe that any studies under court auspices undertaken at this time would add substantially to scientific knowledge, and in the interim no class member would receive any benefit from the settlement. Cf. In re Folding Carton Antitrust Litigation, 744 F.2d 1252, 1254-55 (7th Cir.1984) (allocation of unclaimed portion of fund to research not permissible when existing efforts would be duplicated), cert. dismissed, 53 U.S.L.W. 3854 (U.S. May 17, 1985) (No. 84-1266); In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 859 (E.D.N.Y.1984) (waiting for development of perfect plan, assuming one can be devised, loses much of the value of a settlement, which makes funds available immediately). So far as research is concerned, the government has effectively assumed its obligation.
The only research for which the court will authorize funding is that incidental to the work of the class assistance foundation. See infra Part V.D. Research-related services could form a valid component of the foundation's program in two limited respects. First, monitoring and oversight of existing research could be funded to ensure that all research gaps are addressed, that data analysis takes into account all possibilities, and that research is performed thoroughly and efficiently. Second, if financially feasible and to the extent not addressed by other sources, limited funds might be provided for specific, applied research to develop techniques to help treat the medical problems of the class. For example, it may come to the attention of the foundation as a result of the monitoring of some of its grants that particular research is required. There would be no objection to using limited funds to "seed" such research or to seek governmental or private resources to conduct it if the probability of benefit to the class is substantial.

C. Medical Treatment and Health Care Services

Many class members have suggested funding a variety of medical treatment and health care services ranging from the establishment of a hospital for Agent Orange class members to the purchase of medical and health insurance. For a number of reasons, these suggestions cannot be adopted.
The funding of a hospital for the treatment of problems believed to be related to Agent Orange exposure is impractical. Expenditure of the entire settlement fund would be required to set up an institution of any significant size. Operation costs would be very great. Even if the fund were not exhausted by capital expenditures, it soon would be by a variety of required subventions. In general, there is no shortage of hospital beds in this country. Moreover, even if the proposed hospital were centrally located, very few class members would be able to use it. Providing good hospital care is an obligation of the Veterans Administration.
A medical insurance plan is undesirable for several reasons. First, it would essentially duplicate rather than supplement existing services. The Veterans Administration has been criticized by many class members. Nevertheless, it is obligated to provide free medical treatment to Vietnam veterans who may have been exposed to a toxic substance found in herbicides and whose health problems are not clearly attributable to other causes. See 38 U.S.C. § 610. In addition, many if not most class members have access to private medical insurance or are eligible for Medicare or Medicaid. An Agent Orange medical insurance plan would simply duplicate coverage and perhaps displace benefits provided *1407 under private insurance contracts or governmental programs. In effect, the fund would be used to benefit not veterans, but private insurers or governmental assistance programs.
Second, the fund could not afford to provide substantial medical insurance coverage. A program offering comprehensive major medical insurance would be prohibitively expensive. Comprehensive major medical coverage typically costs $1,000-$1,200 per person per year for a normal population. Report of the Special Master Pertaining to the Disposition of the Settlement Fund, dated February 27, 1985, p. 72 n. 33 ("Special Master's Report"). Multiplying this figure by the approximately 245,000 claims already filed yields a cost of over $245 million for one year. And this cost does not take into consideration the fact that the claimants are a self-selected population, presumably including many with severe medical problems, so that premiums would have to be much higher than for an average population.
A catastrophic health insurance plan also would be very expensive. For example, catastrophic medical coverage, with a $100,000 deductible per year, costs about $100 per year per person for a normal population. Special Master's Report, p. 73 n. 34. Doubled for a self-selected population with severe medical problems, and multiplied by 245,000 claimants, the cost would total $49 million per year. Provision of full coverage for preexisting medical conditions would be even more expensive. Such a plan might be affordable for a few years as the sole program offered by the fund, but it would only benefit those claimants who are relatively well-off. Claimants with severe, long-term illnesses who do not have substantial financial resources or insurance would be unable to pay the costs needed to trigger catastrophic coverage. Such claimants instead would probably receive assistance from various governmental programs. Thus, for the most needy claimants, catastrophic health insurance would provide no additional benefit. Such a program clearly is an undesirable use of the fund.
A fixed-term hospital indemnity insurance plan would be relatively easy to administer and could be made affordable by limiting the total indemnity for each claimant and including a large deductible. But payments would not be high enough to compensate significantly for medical cost. A hospitalization payment moreover would target settlement funds toward claimants who are not necessarily the most sick, the most disabled, or the most in need. The indemnity plan also might provide an incentive to extend hospitalization unnecessarily.

D. High Compensation for Specific Diseases

The Agent Orange Plaintiffs' Management Committee ("PMC") has proposed that a large group of specified diseases be compensated if exposure to dioxin-contaminated Agent Orange is shown. These diseases are suspected of being associated with dioxin exposure in laboratory studies or industrial settings. This proposal is essentially a tort-based compensation scheme, based upon an assumption of a causal connection between Agent Orange exposure and a given disease. It requires claimants to submit substantial medical, diagnostic and other proof.
The diseases proposed to be compensated include chloracne; peripheral and central neuropathy; various liver disorders including cirrhosis, chronic hepatitis and porphyria cutanea tarda; gastrointestinal conditions; hematological, endocrinal and metabolic problems; all benign and malignant tumors; and birth defects and miscarriages. See Plaintiffs' Preliminary Plan for Allocation and Distribution of Settlement Fund, filed November 26, 1984, pp. 9-13. The PMC's proposal also suggests making payment for some additional medical problems that "seem to have been reported in the literature as possibly accompanying Agent Orange exposure." Id. at 13. These allegedly Agent Orange-related problems include arthritis, photophobia, diarrhea, heart burn and abdominal pain. Id.
Each claimant who could show that he or she suffered from one or more of these *1408 medical conditions would be entitled to be considered for a benefit payment. Each claim would be discounted to reflect the legal problems with the plaintiffs' case. An "individual discount factor" also would be applied to each award to reflect "individual causation risks"that is, the factual problems that would have arisen in proving each individual class member's claim in court. The method of calculating the "individual discount factor" is not clear, but it would take into account such factors as "exposure to Agent Orange; exposure to dioxin; levels of exposure to Agent Orange and/or dioxin; individual medical history; family medical history; lifestyle considerations; various confounding factors; specific causation; proximate causation; and damages." Id. at 14. After legal and factual discounts had been made, each award would be increased or decreased based on other criteria specific to each claimant, including availability of collateral source benefits and number of dependents. Id. at 15.
The PMC's plan suffers from a number of serious defects. Based on the information presently available, no substantial evidence of causality exists as between dioxin-contaminated Agent Orange exposure and any given disease or medical problem, with the exception of chloracneand chloracne alone should not be compensated according to a spokesman for the PMC. See, e.g., In re "Agent Orange" Product Liability Litigation, 611 F.Supp. 1221, 1222 (E.D.N.Y. 1985); 611 F.Supp. 1223, 1260 (E.D.N.Y. 1985); 603 F.Supp. 239, 245-47 (E.D.N.Y. 1985); 597 F.Supp. 740, 777-95 (E.D.N.Y. 1984); H.R.Rep. No. 592, 98th Cong., 2d Sess. 5, 7, reprinted in 1984 U.S.Code Cong. & Ad.News 4449, 4451, 4453; Transcript of March 5, 1985 Hearing, p. 182 (testimony of David Dean, Esq.). Any list of diseases such as that used in the PMC's plan would certainly be open to criticism as arbitrary and lacking in scientific foundation. Moreover, "[t]here is a strong likelihood that even if some causal link could be established between Agent Orange and the diseases from which plaintiffs claim they are suffering, it would be impossible in most cases to identify the individual class members who were injured by Agent Orange." In re "Agent Orange" Product Liability Litigation, 597 F.Supp. at 842. Great controversy would attend the determinations that would have to be made about whether individual claimants' diseases were "caused by" Agent Orange exposure or would have occurred as part of the normal background incidence of disease in the general population.
Given the lack of scientific basis for general causation and the significant uncertainties involved in proof of individual causationthat is, the indeterminate plaintiff problemit cannot now be established with any appropriate degree of probability that any individuals who suffer from the diseases listed in the PMC's plan incurred them as a result of Agent Orange exposure, or that these diseases are more likely than others to be causally related.
It is significant that the PMC has never been able to estimate the number of cases of each of the diseases for which it would compensate. Nor has it been able to show any evidence that the incidence of the disease among Vietnam veterans is greater than among a like population of nonveterans. See In re "Agent Orange" Product Liability Litigation, 611 F.Supp. 1223, 1231 (E.D.N.Y.1985) (analysis of epidemiological data); 597 F.Supp. 740, 775-95 (E.D.N.Y.1984).
Necessarily, the contemplated inquiry would involve a great deal of work by attorneys, doctors and claims administrators. Claimants would have to assemble extensive evidence including sophisticated medical tests to prove specific diseases. Such a requirement would be burdensome, expensive and emotionally trying for the claimants. The transaction costs of such a distribution plan would be substantial.
The cost of establishing the PMC's "individual discount factor" could be enormous for both the fund and the claimant, depending on the degree to which the PMC would insist on proof of causation for each individual claimant. Even if a categorical discount factor were established for each disease *1409 based on probability of causal connectiona determination that would be speculative at best in light of presently available scientific evidencemany variables unique to each individual would have to be documented and accounted for, all at substantial cost to all concerned.
No comprehensive estimates of the administrative costs to the fund and the costs to individual claimants of producing the requisite medical proof and other documentation has been provided by the PMC. It has been estimated that such a plan might cost as much as $800 to $1,000 per claim. See Special Master's Report, pp. 71 n. 32, 343. The PMC recently provided a one-page estimate of the cost of running a claims facility. See Memorandum of Agent Orange Plaintiffs' Management Committee in Opposition to Report of the Special Master Pertaining to the Disposition of the Settlement Fund, app., filed May 7, 1985. The underlying assumptions and other bases for the figures provided are not explained. The figures appear to be low for the type and degree of claims processing required by the PMC's plan. Compare id. with Special Master's Report, pp. 53-54. Moreover, no estimates of the aggregate transaction costs of the PMC's plan are given.
A probable result of implementing this plan would be that too great a share of the fund would go to lawyers and medical experts in a vain effort to capture a will-o'-the-wisp causal connection that simply cannot be established at this time. Moreover, a handful of veterans might get large recoveries, while the vast majority would get nothing, all on the basis of controversial and speculative causal distinctions. This kind of lottery is inequitable and inappropriate.
The PMC's plan could be modified to eliminate much of the administrative costs and costs to the claimants. The list of compensable medical conditions could be limited to a small number of relatively rare diseases that might be caused by dioxin exposure, diseases that are uncommon in the general population and easily diagnosed. Such a plan would have the seeming virtue of addressing a common, albeit mistaken perception of causality held by even educated laypersons: Because the listed diseases would be unusual, a claimant suffering from one of them might well believe that his or her condition was unique in the general population and that its cause must be related to the veteran's special experience in Vietnam.
In fact, based on currently available scientific evidence, there is no reason to believe that the incidence of any unusual physical problem is greater among those exposed to Agent Orange than among any similar cohort of the unexposed. The number of cases of these diseases among class members could be estimated fairly accurately for past and future years. See, e.g., In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 786 (E.D.N.Y. 1984) (chart showing cumulative expected number of deaths broken down by cause); 611 F.Supp. 1223, 1251 (E.D.N.Y.1985) (mortality caused by hepatitis). Class members suffering from such diseases could be ascertained by medical examination. Exposure determinations would be no more difficult than under any other plan. See infra Part IV.D. Detailed inquiry into "individual discount factors" could be eliminated. Award grids based on severity could readily be devised. The number of awards would be no more than a few thousand.
Such a plan would result in average recoveries of several hundred thousand dollars with relatively low aggregate transaction costs. The same fundamental difficulty associated with any tort-based compensation scheme, however, would persist: No factual basis exists for choosing or excluding any disease, since causation cannot be shown for either individual claimants or individual diseases with any appropriate degree of probability. The choice of diseases and hence persons to be compensated is essentially arbitrary.
Approval of the PMC plan in any form would be inconsistent with the court's responsibility to the class under Rule 23(e) to provide for an equitable allocation of the settlement fund. See, e.g., Curtiss-Wright *1410 Corp. v. Helfand, 687 F.2d 171, 174-75 (7th Cir.1982); In re Equity Funding Corp. of America Securities Litigation, 603 F.2d 1353, 1363, 1365 (9th Cir.1979); Beecher v. Able, 575 F.2d 1010, 1016 (2d Cir.1978); Zients v. Lamorte, 459 F.2d 628, 630 (2d Cir.1972); In re Folding Carton Antitrust Litigation, 557 F.Supp. 1091, 1108-09 (N.D.Ill.1983), aff'd in pertinent part, 744 F.2d 1252, 1254-55 (7th Cir.1984), cert. dismissed, 53 U.S.L.W. 3854 (U.S. May 17, 1985) (No. 84-1266).

E. Death and Disability Payment Program and Class Assistance Foundation

A distribution plan for a settlement in a tort class action should as far as possible reflect the traditional tort law principle that individuals will receive monetary compensation for their injuries. See supra Part II. The common law generally holds that money damages are a preferred remedy. Many class members apparently have assumed that the distribution would be based on this premise. Accordingly, a major portion of the settlement fund should be distributed in the form of individual awards if at all possible.
To be both practicable and fair, a program of individual benefits must minimize transaction costs, be relatively easy to administer and involve relatively simple, understandable and objective eligibility criteria, while maximizing protection of those said to have suffered as a result of exposure to dioxin-contaminated Agent Orange. The presently available evidence of causation is far too speculative to serve as the primary basis for a distribution plan, although exposure must be used as an eligibility criterion because of the class definition.
The only realistic means of proceeding with distribution that sufficiently addresses these concerns is embodied in the Special Master's Report. Payments will be made for death and long-term total disability among veterans. See infra Part IV. Three-quarters of the settlement fund, or $150 million, will be set aside for this program, which will be administered by an insurance company or other appropriate disbursing institution or institutions, subject to court supervision. Only those exposed will be eligible.
Under this plan only totally disabled veterans and the surviving spouses or children of deceased veterans will receive individual cash awards. The class as a whole, however, will benefit significantly in other ways. As discussed infra Part V, about one-quarter of the settlement fund, or some $45 million, will be turned over to a class assistance foundation. The foundation will fund services on behalf of the class as a whole, including aid to children of veterans and their families in coping with birth defects. The foundation's work will provide useful and meaningful benefits to those class members not eligible for direct individual awards. About 2.0% of the fund, or $4 million, will be available to be administered separately for the benefit of Australian and New Zealand claimants. See infra Part VI.
Given "the manifest inadequacy of the alternative solutions that have been proposed," In re Folding Carton Antitrust Litigation, 557 F.Supp. 1091, 1109 (N.D.Ill. 1983), aff'd in pertinent part, 744 F.2d 1252, 1254 (7th Cir.1984), cert. dismissed, 53 U.S.L.W. 3854 (U.S. May 17, 1985) (No. 84-1266), this plan provides the only reasonable formula for distribution. See id.; In re Corrugated Container Antitrust Litigation, 659 F.2d 1322, 1328-29 (5th Cir. 1981), cert. denied, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982); Detroit v. Grinnell Corp., 356 F.Supp. 1380, 1388-89 (S.D.N.Y.1972) (under across-the-board settlement distribution, "some claimants will receive less than they are entitled to, as a percentage of actual damage suffered, while others receive more," but "the formula adopted is the only realistic one" available), aff'd in pertinent part, 495 F.2d 448 (2d Cir.1974); supra Part II.

IV. PAYMENTS FOR DEATH AND TOTAL DISABILITY OF EXPOSED VETERANS
Under the payment program, individual awards will be made only to exposed veterans *1411 who suffer from long-term total disabilities and to the surviving spouses or children of exposed veterans who have died. A number of reasons exist for channeling individual compensation payments to class members in these categories.
First, the settlement fund, though large in absolute terms, is not sufficient to satisfy the claimed losses of every class member. An "equitable allocation of the large settlement fund [must be made] among the even larger claims of the various class members." In re Equity Funding Corp. of America Securities Litigation, 603 F.2d 1353, 1363 (9th Cir.1979). Although a meaningful individual cash award cannot be paid to every claimant, a class assistance foundation will be created to fund services to help meet the needs of the entire class. Every class member will be eligible to benefit from this aspect of the distribution plan. See infra Part V.
Second, however slight the suggestion of a causal connection between the veterans' medical problems and Agent Orange exposure, even less evidence supports the existence of an association between birth defects and exposure of the father to Agent Orange in Vietnam. See In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 777-95 (E.D.N.Y.1984). This distinction does not imply that the miscarriage and birth defect claims were frivolous: If the spouses and children of the veterans were "completely without any colorable legal claims against defendants, it would [be] an abuse of the court's discretion to allow them to share in the settlement fund." In re Chicken Antitrust Litigation American Poultry, 669 F.2d 228, 238 (5th Cir.1982). Yet, if one set of claims had a greater likelihood of ultimate success than another set of claims, it is appropriate to weigh "distribution of the settlement * * in favor of plaintiffs whose claims comprise the set" that was more likely to succeed. In re Corrugated Container Antitrust Litigation, 643 F.2d 195, 220 (5th Cir.1981), cert. denied, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982). See also In re Equity Funding Corp. of America Securities Litigation, 603 F.2d 1353, 1364-66 (9th Cir.1979); In re Investors Funding Corp. of New York Securities Litigation, 9 B.R. 962, 964 (S.D.N.Y.1981); Dunn v. H.K. Porter Co., Inc., 78 F.R.D. 50, 53-54 (E.D. Pa.1978); cf. Holmes v. Continental Can Co., 706 F.2d 1144, 1148 (11th Cir.1983) ("there is no rule that settlements benefit all class members equally" and "higher allocations to certain parties [may be] rationally based on legitimate considerations").
Third, the plan targets for benefits those veterans who have suffered the most severe injuries. Limiting the program to death and total disability benefits without requiring proof of a specific disease or a causal connection also minimizes transaction costs, which would almost certainly be overwhelming if any of the other individual award proposals submitted to the court were implemented. See, e.g., supra Part III.D. Proof of eligibility will be relatively simple and will not impose on the applicant the enormous burdens of producing volumes of medical records and paying expensive medical and legal fees for complicated processing and testing. An outside contractor such as an insurance company has the necessary skills and experience and can process such claims at minimum cost to the fund, particularly because relatively little documentation and handling will be needed. Creation of a costly new claims-processing bureaucracy, which would devour money that should go to class members, thus is avoided. "The proposed method of distribution will maximize the value of the recovery actually received by the class." Ohio Public Interest Campaign v. Fisher Foods, Inc., 546 F.Supp. 1, 11 (N.D.Ohio 1982).
Finally, this plan "obviate[s] the necessity for particularized proof" and is "a fair response to the particular difficulties that this class would have in gathering and presenting evidence of damages." In re Chicken Antitrust Litigation American Poultry, 669 F.2d 228, 240 & n. 20 (5th Cir.1982). See also Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 260-63 (5th Cir.1974), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); Women's Committee for Equal Employment *1412 Opportunity v. National Broadcasting Co., 76 F.R.D. 173, 178-79 (S.D.N.Y.1977).
In distributing the settlement fund, every possible effort should be undertaken to alleviate the suffering of men, women and children in the class. But compassion, though heartfelt, must be tempered with a down-to-earth sense of what can and what cannot be done. The needs of the class must be weighed against the realities of what can be accomplished given the amount of money available, the danger that administrative, medical and legal costs will bankrupt the fund, and the premise that if anyone was injured by Agent Orange it was the veterans who were directly exposed. Attainment of a just result requires that a balance be struck among "competing notions of reasonableness," in favor of the veterans themselves. In re Corrugated Container Antitrust Litigation, 659 F.2d 1322, 1325 (5th Cir.1981), cert. denied, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982). The choices are difficult, but they must be made.

A. Compensable Death or Disability

Awards will be made for the death or total disability of a veteran. All deaths and total disabilities will be compensable, regardless of what disease was the cause, unless predominantly caused by trauma, whether or not self-inflicted. All veteran claimants who file a claim will receive a notice confirming that they or their eligible survivors may file for compensation upon proof of exposure if death or total disability occurs before the expiration of the payment program. See infra Part VII.A.1.
The reasons for limiting compensation to death and total disability have already been stated. The exclusion of traumatic injuries rests on different grounds. The causal connection between Agent Orange exposure and specific health conditions is too speculative to serve as a basis for distribution, but injuries and deaths nevertheless may be excluded as not compensable if they are manifestly unrelated to Agent Orange exposurefor example, those incurred in automobile accidents, homicides, suicides and war wounds. Given that a relatively limited fund must be distributed among a large number of potentially eligible claimants, it is reasonable and equitable to exclude those claims that are unquestionably unrelated to Agent Orange exposure in Vietnam.
Denial of compensation for all deaths or disabilities resulting from traumatic injuries will eliminate the most prevalent causes of death or disability that are clearly unrelated. It is reasonable to make self-inflicted injuries or suicides ineligible for payment as well, notwithstanding the theoretical possibility that Agent Orange might have contributed in some way to the depression that induced the injury. A rule that holds veterans responsible for self-inflicted harm will counteract any incentive toward suicide that provision of a death benefit from the fund to a veteran's eligible survivors might unintentionally create.
A rule that excludes traumatic, accidental and self-inflicted injuries will be simple to administer. They are relatively easy to define and determine. Aside from injuries in these categories, all others will be compensable. Few medical conditions are uncontrovertibly unrelated to Agent Orange exposure. A determination of whether one of these conditions caused a particular veteran's death or disability would require complex procedures that would be far too costly and time-consuming.

B. Determining Total Disability

An objective test for disability is needed that will provide clear, easily administrable guidelines. The enormous expense and time required for individual adjudication hearings must be avoided.
Determinations of long-term total disability will be based on the definition of disability found in the Social Security Act. 42 U.S.C. §§ 301-1397f. Section 223 of the Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).
*1413 Use of the Social Security Act definition of "disability" has a number of advantages. First, it would be relatively easy to apply given the extensive guidelines and precedents already developed under the Social Security program. Second, claimants are likely to be familiar, at least in general, with the elements of disability under this definition. Third, it would provide a cost-effective and easily administered eligibility screen. Since a similar definition of disability is found in many insurance policies, claims processing facilities are already equipped to apply such a definition efficiently and consistently. Fourth, and perhaps most important, the payment program could minimize some administrative costs by accepting Social Security determinations of disability as evidence of eligibility for veterans who are already receiving disability benefits.
Because reviewing medical evidence to determine whether an individual is disabled involves administrative costs, the payment program to the extent possible will rely on disability determinations made by the Social Security Administration. Any veteran claimant certified as disabled by the Social Security Administration will be considered disabled for purposes of the payment program, unless the disability was predominantly caused by a traumatic, accidental or self-inflicted injury.
It was recommended by the Special Master that claimants who have not applied for Social Security disability benefits, and who would be eligible for payments under either the Supplemental Security Income (SSI) means test or the Social Security employment test, be required to apply for Social Security and exhaust all appeals within the agency before their application under the payment program would be processed. Special Master's Report, pp. 74-77. Under the Special Master's proposal, once a veteran had received a final ruling from the agency, he would be entitled to an evaluation of disability by the program, if that ruling were unfavorable.
There is considerable merit to this suggestion. Requiring claimants to apply for Social Security as a prerequisite to independent determination under the payment program would result in significant savings in administrative costs to the fund. This requirement, however, would cause substantial delay in disbursing payment to some claimants, even though the veteran would only need to exhaust his or her appeals within the agency.
In addition, the savings to the fund do not justify burdening the Social Security system with the screening costs of this Agent Orange litigation. The court takes judicial notice of the fact that the administrative agency is already considerably strained. Fed.R.Evid. 201. Placing additional stresses on the process to aid private litigants is arguably against public policy. In any event, it is unwise and this requirement is rejected.
In the absence of a finding of disability under the Social Security administrative process, a claimant will have the right to apply to the disbursing agency for compensation. This right shall exist even if the claimant has applied for and been denied or is awaiting a Social Security disability ruling.
Claimants will be required to submit medical evidence, including records, diagnoses, and test results, similar to that required by the Social Security Administration. In determining whether a veteran claimant is eligible for a disability award, the payment program will take into account, as evidence, a Social Security determination that the veteran is not disabled, or certifications of disability from other entities such as the Veterans Administration or private insurers.

C. Proof of Death and Eligible Survivorship

A death certificate ordinarily will be sufficient proof of death. If the certificate does not adequately state the cause of death, further documentation such as medical and hospital records may be required by the disbursing agency to demonstrate that death was not predominantly traumatic, accidental or self-inflicted.
The claimant will be required to establish the deceased's status as a class member veteran and confirm the existence of at least one eligible survivora spouse married *1414 to the veteran at the time of death or a dependent child at time of death. No death benefit will be paid if no such eligible survivor is living at the time of application for an award, see infra Parts IV.H and V.A, even if the survivor was alive when the initial claim form was filed. If there is a surviving spouse, the death award will be paid to her. If there is no surviving spouse, the death award will be divided equally among the dependent children. If death of a claimant occurs after application but before the award is made, it will go to his or her estate.
Proof of eligible survivorship will be the responsibility of the claimant. Because the name of a surviving spouse is generally listed on a death certificate, verification of eligibility for a spouse will be straightforward in most instances. The claimant must sign a certificate of dependency for each dependent child. Documentary evidence will be required to establish a child's dependent status. Such evidence may include a birth certificate, an adoption order, or a child support order issued by a court.
Use of a dependency test to determine whether surviving children should receive death benefits will to some extent help preserve the fund for the most needy claimants. A dependency test also is consistent with the objective of maximizing benefits to the younger veterans because they are more likely to have dependent children. The increase in administrative costs if any will not be significant.

D. Exposure

Claimants will be required to demonstrate exposure to Agent Orange or other phenoxy herbicides during military service in or near Vietnam. Exposure is a legitimate and necessary eligibility criterion because it is embodied in the class definition. See In re "Agent Orange" Product Liability Litigation, 100 F.R.D. 718, 729 (E.D.N.Y.1983), mandamus denied, 725 F.2d 858 (2d Cir.), cert. denied, ___ U.S. ___, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984).
The Special Master's Report recommended restriction of eligibility to the 50 percent of veterans most heavily exposed to Agent Orange in Vietnam, on the grounds that "scientists do agree that the possibility of adverse health effects increases as the amount of exposure increases." Special Master's Report, p. 79 (emphasis in original). Such a restriction would maximize the individual award to each claimant. The Special Master's Report also discussed a graduated payment approach, under which "veterans could be divided into three tiers, depending on whether they received low, moderate or high levels of exposure relative to the other veterans." Id. at 80. The Special Master favored the 50-percent approach as being easier to administer and allowing the maximum payment to be made to a larger number of claimants. Less highly exposed claimants under the Special Master's plan would receive special consideration in the operation of the class assistance foundation. Id. at 81-83.
Objections have been raised to use of either of the exposure options outlined by the Special Master on the ground that it would be divisive, causing widespread dissension among class members. See, e.g., Comments of Vietnam Veterans of America on Plans Pertaining to the Disposition of the Settlement Fund, pp. 7-10, filed April 10, 1985 ("Comments of VVA"). VVA, although generally supporting the Special Master's plan, opposes making the recommended exposure-based distinctions for two reasons. First, a strong correlation between adverse health effects and degree of exposure should be shown before such a criterion is used in deciding how to allocate the fund. No consensus among scientific experts exists on this point; according to VVA "the scientific evidence is not advanced enough to be confident that there is a strong correlation between degree of exposure and the possibility of injury." Id. at 8. Second, VVA states that "[g]iven the exposure information currently available, one cannot place great confidence in the accuracy of determinations on degree of exposure." Id.
The points made by VVA and others on the use of a graduated exposure criterion *1415 have merit. The Special Master's recommended methodology is based on a fundamental theory of toxicology concerning the dose-response relationship of toxic substances. That theory holds that the greater the exposure, the greater the toxic response. See Special Master's Report, p. 362. So far as is known, all toxic substances act with this dose-response relationship. Id. at 371. The theory also has intuitive appeal: If A repeatedly strikes B, B probably is hurt more than if struck only once. But it is possible thatassuming some validity to the theory of causalityindividuals could vary greatly in their susceptibility to dioxin-contaminated Agent Orange exposure. Some might not experience adverse health effects though exposed to high levels of dioxin, while others might fall ill after exposure to relatively low levels. Comments of VVA, p. 8. That is, C, who is struck once, may be injured more seriously than is B, who is struck ten times.
The problems associated with proving degree of exposure and correlating degree of exposure with probability of injury compounds the enormous difficulty of proving causation generally. As already noted, causality is too speculative a basis for distribution. Similarly, the court's duty to ensure an equitable allocation and the desirability of minimizing discord within the class where possible, favor rejection of a graduated exposure factor that lacks a strong empirical basis.
On balance, these concerns outweigh the considerations on which the Special Master relied. Claimants accordingly will be required to demonstrate exposure, but degree of exposure will not be considered in making individual awards.
Some substantial showing of exposure, however, must be made to ensure that only class members who were exposed receive payment. Exposure is a jurisdictional requirement for class membership. A presumption that all claimants were exposed is not workable. This presumption alternative would reduce the maximum possible payment level because of the increase in otherwise eligible claims. That result would be unfair to a truly exposed class member whose award otherwise would be higher. Thus a presumption of exposure of all Vietnam veterans similar to that employed by the Veterans Administration, see 50 Fed.Reg. 15,853 (1985) (to be codified at 38 C.F.R. § 3.311a(4)(b)), cannot be used in connection with the payment program.
A self-reporting method of determining exposure raises similar problems. Such an approach would be an unreliable index of exposure if used alone:
During the Vietnam war, large areas of land were defoliated for reasons completely unrelated to the use of herbicides. Bombing, shelling, constant resettlement, clearing of forests, and agricultural practices all left their mark. Consequently, a veteran could understandably but erroneously assume contact with Agent Orange because he spent time in an area that was defoliated due to some other cause. Thus, a self-reporting system will not effectively screen claimants for exposure.
Special Master's Report, p. 85. However honest the claimants might be, the number of otherwise eligible claims probably would increase in the absence of any objective check on the claimants' assertions of exposure. In addition, dishonest claims could not be screened out. Both results would be unfair to the truly exposed class member who otherwise would receive a higher award. The need to ensure an equitable allocation of the fund requires a greater showing of exposure.
Claimants could be required to submit military records demonstrating a likelihood of exposure. Such records could be useful in corroborating other information on exposure. They are, however, too cumbersome, incomplete and lacking in uniformity to serve as the sole basis for exposure determination, or even as the sole adjunct to self-reporting if other alternatives are available.
Under the Special Master's recommendations, a veteran who performed a job involving direct handling or application of Agent Orange, such as backpack spraying, would be deemed exposed. Other veterans *1416 would be processed under an objective computerized exposure evaluation system:
The methodology would call for complex calculations based on information regarding a veteran's service location and on information on spraying operations obtained from the HERBS tape. The HERBS tape is a computerized record of individual herbicide dissemination missions in Vietnam, which was prepared from log books maintained at U.S. military headquarters in Saigon. The HERBS tape contains precise information on the location of spray missions, and both the type and quantity of herbicide used.
Special Master's Report, p. 86 (footnote omitted).
The HERBS tape does not contain a complete record of herbicide spraying in Vietnam. At present, it accounts for neither pre-1965 aerial spraying nor nonaerial spraying. Id. at 95. Agent Orange itself, of course, did not come into use until early 1965, but other phenoxy herbicides had been used earlier. In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 775-76 (E.D.N.Y.1984). The National Academy of Sciences nevertheless has estimated that the HERBS tape covers about 86 percent of herbicide use in Vietnam, and updated information may become available in the future. Special Master's Report, p. 95 & n. 42. The Academy has concluded that the HERBS tape is a reliable record of herbicide operations. Id. at 86 n. 41.
The HERBS tape thus can serve as a reasonable starting point for exposure determination in conjunction with military records and claimants' affidavits asserting exposure. Accordingly, the Special Master's recommendation to this extent is adopted. In processing claims, two basic steps will be followed.
First, a questionnaire will be sent to all claimants. In addition to providing information concerning death or disability, each claimant will be asked to indicate the dates and locations of the veteran's Vietnam service. If certain veterans or their surviving families cannot recall this data, the institution administering the payment program insofar as possible will help such claimants obtain and evaluate information about the veterans' service history. Such assistance might be provided through the class assistance foundation. See infra Part VII.A.5.
The questionnaire also will ask whether the veteran held a job in or near Vietnam involving direct handling or application of Agent Orange. It will include an authorization to obtain military records to confirm the claimant's statements.
Second, the questionnaire data will be analyzed by objective criteria. The following test will be used:
(1) Any veteran who held a job involving direct handling or application of Agent Orange will be considered exposed. This category includes backpack sprayers; sprayers on airplanes, helicopters or boats; and loaders or handlers of spraying equipment. Military records will be used to confirm claims in this category.
(2) All other claims will be evaluated under a computerized process that will compare the veteran's location data with the HERBS tape data to determine the correlation, if any, between the veteran's whereabouts in Vietnam and the location of spraying missions.
Exposure to Agent Orange residues from past spraying as well as to contemporaneous Agent Orange spraying will be considered in making this evaluation, accounting for the possibility that a veteran might have been exposed to Agent Orange not only through his presence in an area during spraying, but also by walking, sleeping or drinking contaminated groundwater in or near a contaminated area well after spraying. But because degree of exposure will not be considered in making awards, and because exposure or its absence will be the central criterion, the Special Master's recommended evaluation methodology must be modified. The following criteria will be used in determining whether or not a veteran was exposed to Agent Orange for purposes of making awards from the settlement fund.
*1417 First, a veteran who was present in a sprayed area when the spraying occurred will be considered exposed. Second, some temporal and geographic limits must be set to determine whether a veteran who was in a location near a sprayed area at or subsequent to the time of spraying will be considered exposed. Because location data has not yet been submitted for the veterans comprising the claims population, the time and place parameters to be used to determine exposure for fund distribution purposes cannot be established with certainty at this time. Nevertheless, some limits will have to be determined if the exposure requirement is to have any meaning. In order to give preliminary guidance in structuring the payment program, some tentative requirements will be needed. Preliminary and final time and place parameters will be subject to court approval on recommendation of the Special Master or disbursing agency in light of the nature and quality of the data subsequently submitted by claimants.
Because the HERBS tape does not account for all possible exposures, an appeal process will be available to supplement HERBS tape determinations. Veterans who claim exposure despite a contrary exposure index finding could obtain further consideration of their claims, ordinarily on a written record, through an appeal to an independent board of review. See infra Part IV.H.4. The board of review will consider the veteran's military records and any other documentation submitted by the veteran in rendering a decision.

E. Payment Program Time Limits

Only those who file timely claim forms will be considered for individual awards. See the filing deadline requirements outlined supra Part I.
Of the approximately 245,000 claims received as of the date of this opinion, about 12,000 were filed late. The most common reason given for the failure to meet the filing deadline is lack of knowledge of (1) the lawsuit, (2) the need to file a claim, or (3) the deadline itself. The court has the power to accept late claims in the exercise of its equitable discretion. See, e.g., In re Gypsum Antitrust Cases, 565 F.2d 1123, 1128 (9th Cir.1977); Zients v. Lamorte, 459 F.2d 628, 630-31 (2d Cir. 1972); In re Folding Carton Antitrust Litigation, 557 F.Supp. 1091, 1103-04 (N.D.Ill.1983), aff'd in pertinent part, 744 F.2d 1252 (7th Cir.1984), cert. dismissed, 53 U.S.L.W. 3854 (U.S. May 17, 1985) (No. 84-1266); Seiffer v. Topsy's International, Inc., 70 F.R.D. 622, 625 n. 1 (D.Kan.1976). Accordingly, all claims filed by the date of this opinion will be considered timely.
No further consideration of claims filed late will be made unless the court determines that good and special reason exists for failure to meet the deadline. Class members seeking compensation from the fund in the future must file a claim form or application for payment within 120 days after the veteran dies or learns of a total disability.
The payment program will run for ten years, beginning January 1, 1985 and ending December 31, 1994. No payment will be made for death or disability occurring after December 31, 1994. Payment will be made for compensable deaths occurring both before and after January 1, 1985. Payments will be made for compensable disability to the extent that the period of disability falls within the ten years of the program's operation. In addition, initial claimants will receive a premium to account for each year the veteran was disabled in the past, up to a total of 15 years.
The court reserves the right to shorten the ten-year operating life of the payment program should unforeseen circumstances occur, such as an unexpected and prolonged drop in interest rates, or a significant increase in claims above those expected.

F. Structure and Amount of Disability and Death Benefits

Payment levels will be dependent on the total number of disabled or deceased veterans for whom claim is made, the number of claimants meeting exposure requirements, as well as other factors relating to how the payment program is structured. The figures *1418 set forth below are estimates based on data presently available. They are subject to adjustment, either upward or downward, once supplemental information has been submitted by the claimants.
The figures are derived from (1) quantitative predictions of death and disability based on statistical analysis of a randomly selected sample of claim forms, the court's review of another randomly selected sample of claim forms, and the court's experience with disability claims in Social Security cases, (2) exposure studies and analysis by scientific consultants, and (3) a cross-check of claimants against Social Security disability rolls. None of this data permits firm extrapolations. Nevertheless, the information taken as a whole is sufficiently instructive so that it may reasonably be used for purposes of this opinion as a basis for estimating the amount of the awards that ultimately will be made. As more precise data becomes available in the processing of claims by the disbursing agency, firmer estimates of benefits can be made.

1. Disability Benefit

Under the death and disability benefit program outlined in this opinion, it is estimated that the maximum award for disability will be about $12,800, paid over a ten-year period. Under the Special Master's proposed plan, the maximum payment would have been about $25,000. Essentially, the difference arises from the higher number of claimants potentially eligible for compensation under the more liberal exposure criteria of the court's plan, see supra Part IV.D, and from the increase in the number of claims over the Special Master's estimate, including late claims that will be accepted for processing. See supra Part IV.E.
Disability awards will be payable in annual installments. Individual awards for disability will vary according to the age of the veteran and the duration of disability. Higher payments will be made for longer disability periods and to younger veterans. Disability awards will end if the period of total disability ends, through either recovery or death.
(a) Variation in Award Based on Age and Year of Occurrence. This litigation concerned the exposure of young servicepersons to dioxin-contaminated Agent Orange in Vietnam. In a young population, the background incidence of disease-connected disability and death is relatively low. Consequently, the disabilities and deaths of young veterans occurring relatively soon after their return from Vietnam are more likely to be perceived as associated with Agent Orange exposure. In contrast, disabilities or deaths occurring many years after service in Vietnam, or among older veterans for whom the background incidence is higher, have a relatively diminished connection with Agent Orange exposure in terms of both public perception and the likelihood of intervening or contributing causes.
The highest total benefit, therefore, will be awarded to those who became disabled soon after exposure at a relatively young age and who continue to be disabled throughout their primary income-producing years. Implementing this goal while providing significant compensation for existing and future disabilities will require payment levels to be varied according to (1) duration of disability both in the past and in the future, and (2) the veteran's age during the period of disability.
Under this framework, all veteran claimants will receive an award consisting of an incremental payment for each year of total disability after January 1, 1985 through the program's ten-year life. That is, an installment payment will be made for each year remaining in the program at the time the claimant becomes totally disabled, if the claimant is totally disabled during the year for which the installment is payable. The question of prorated payment will be addressed during implementation. See infra Part IV.F.1.d.
No credit, however, will be given for any year of disability after a veteran's 60th birthday. The few veterans over age 50 at the inception of the program on January 1, 1985 thus will receive lower total awards.
In addition to an award for future disability during the life of the program, a *1419 claimant already disabled on January 1, 1985 will receive a premium for each year of past disability, up to a total of 15 years, or beginning January 1, 1970. Because the payment program's emphasis should be on compensation for currently disabled veterans for their existing health problems and for veterans who become disabled in the future, the yearly rate for future disability will be twice that for past disability. Again, no payment will be made for any year of disability after a veteran's 60th birthday. A veteran turning 60 on or before January 1, 1985 is still eligible for a payment for each year of total disability between January 1, 1970 and the veteran's 60th birthday, though not for payments for future disability.
The claimant most qualified under these guidelines is one who was disabled for 15 full years as of January 1, 1985, remains disabled and under age 60 for the ten-year duration of the program, and meets all other eligibility criteria. To permit a $12,800 award to individuals in this category, the yearly rate for future disability would be set at $731 and the yearly rate for past disability at one-half the future disability rate, or $365.50. The maximum future disability award would be $7,310, and the maximum past disability award would be $5,482.50, for a total of $12,792.50. The following table gives six examples of possible awards based on the estimated $12,800 maximum. The figures given are based on three assumptions: continuous disability from year of onset of disability; payments to be made in annual installments over ten years; and age of the claimant of 50 or less on January 1, 1985.

 FIRST
 FULL TOTAL BENEFIT TOTAL BENEFIT
 YEAR OF FOR PAST FOR FUTURE TOTAL
DISABILITY CONTINUOUS DISABILITY CONTINUOUS DISABILITY AWARD
1970 $5,482.50 $7,310 $12,792.50
 (15 years of past (10 years of future
 disability) disability)
1975 $3,655 $7,310 $10,965
 (10 years of past (10 years of future
 disability) disability)
1980 $1,827.50 $7,310 $ 9,137.50
 (5 years of past (10 years of future
 disability) disability)
1985 $ -0- $7,310 $ 7,310
 (10 years of future
 disability)
1990 $ -0- $3,655 $ 3,655
 (5 years of future
 disability)
1995 $ -0- $ -0- $ -0-

Under this payment system, the maximum total award will go to claimants who are age 50 or less as of January 1, 1985 when the program begins, who have been disabled for 15 years or more as of that date, and who remain disabled throughout the program's ten-year duration. This approach targets for maximum payments veterans who are between the ages of 32 and 50 at the program's inception, who were disabled in 1970 (then between ages 18 and 35), and who remain disabled for the full ten years of the program.
(b) Onset of Disability and Payment for Past Disability. The amount of a veteran's award for disability will depend on the duration of the disability. To receive credit for past disability, the claimant must demonstrate the date of onset of disability. For veteran claimants who have been certified as disabled by the Social Security Administration, *1420 the program will use the Administration's determination of the date of onset. For claimants whose date of disability has not been determined by Social Security, the program will apply a presumption that the disability began as of the first day of the program, January 1, 1985, or as of the date on which the claim is filed, whichever is later. The presumption may be overcome by evidence clearly demonstrating the date of onset. Such evidence would include, for example, a determination of the date of onset made by disability programs other than Social Security, such as those of the Veterans Administration.
(c) Termination of Payment. A disability award should end if the period of disability ends, whether by recovery or death. Each award will be paid in annual installments, and payments will cease if during the program's ten-year life either the veteran's condition improves so that he is no longer totally disabled or the veteran dies. If a veteran receiving disability payments dies before the end of the payment program, the veteran's eligible survivors will receive a payment at the applicable rate for the year of death. Payment for the year in which the veteran dies will be at the disability benefit rate rather than the death benefit rate.
(d) Other Criteria for Calculating Payment. Criteria must be established to determine the length of time a veteran actually must be totally disabled before becoming eligible for payment, if any; how payments for disabilities beginning and ending during calendar years will be handled; the date of onset of total disability; and the date of termination of total disability, if any. These refinements will be undertaken in implementing the payment program. The administering institution is likely to have far greater expertise in defining this kind of administrative guideline. Further data is needed from the claimants in any case before eligibility and other criteria can be finalized.
Some examples of the questions that remain to be addressed in implementation are as follows. Because the payment program is intended to compensate long-term total disability, it may be desirable to require a veteran to remain disabled for some period of timeperhaps a yearbefore becoming eligible for payment; for example, a veteran who becomes totally disabled on July 1, 1985 would have to remain disabled through June 30, 1986. Decisions also must be made about whether and when to award prorated payments for disabilities beginning and ending during a given year. In the example, the veteran might be awarded a payment prorated between the two calendar years of disabilitysix months at the 1985 level and six months at the 1986 level (assuming recovery on July 1, 1986). If proration of payment for either onset or termination is considered, the manner of determining the dates of onset and termination must be defined with some specificity. All these matters will be considered further during the actual implementation of the payment program. It is neither necessary nor desirable to address them in approving a general framework for distributing the settlement fund.

2. Death Benefit

Surviving spouses or children of veterans who died before January 1, 1985 are eligible for the maximum death benefit. Survivors of veterans who die on or after January 1, 1985 and before January 1, 1995 will receive an award based on the number of years remaining in the program including the year of death.
The Special Master recommended that death benefits be substantially lower than disability benefits. Special Master's Report, pp. 113-14. It was felt that a program primarily offering payments to a deceased veteran's survivors might make veterans feel that they were worth more dead than alive. The distribution plan for this and other reasons will place primary emphasis on helping veterans while they are still alive. Provision of a more modest death benefit allows greater compensation to be given to living but disabled veterans.
Under the Special Master's proposal, the maximum death award would be $5,000, *1421 payable in annual installments over the program's ten-year duration. The Special Master recommended an installment-based payment plan to keep funds in reserve for unexpected future claims and to permit higher total benefits by generating interest. The objection has been raised in submissions to the court that spreading a relatively modest death payment over a ten-year period significantly diminishes the benefit to the claimant. The retention of control in disbursement of the funds also might be resented by some claimants.
Death benefits accordingly will be paid in a lump sum. Based on presently available data, the maximum payment will be $3,400. The cost of providing death benefits will be about $14 million more than the cost of the Special Master's program, because of the increase in claims that will be considered timely filed. See supra Part IV.E.
The maximum death benefit will be payable for a veteran who died before January 1, 1985. Survivors of a veteran who dies during the ten-year life of the payment program will receive a lump sum payment equal to the applicable yearly rate ($340 per year, based on current data) for each year remaining in the program at the time of the veteran's death including the year of death. For instance, based on present estimates, if a veteran dies in 1989, the survivors will be eligible for a lump-sum award of $2,040 ($340 per year for each of the six years remaining in the program).
As previously noted, the amount of a disability award will depend on the age of a veteran. The same variation in death payments must be made for the same reasons it will be made in disability payments. In addition, such a variation will avoid troubling discrepancies. An example will illustrate the problem. A veteran disabled as of January 1, 1985 will turn 60 on January 2, 1986. Under the disability payment program, he would receive an award ($731, based on current data) for the one year of disability for which he was under age 60. The veteran may remain disabled for the remaining nine years in the program, but is not eligible for further compensation. But if he dies during 1985, before his 60th birthday, his survivors are eligible for a lump-sum death benefit payable immediately ($3,060 under present estimates, $340 per year for nine years), in addition to the disability award he would have received had he lived. Limiting payment to deaths occurring before age 60 would not solve the problem. Preservation of the payment program's emphasis on compensating veterans while still alive thus requires that the age of a veteran at the time of death be considered in computing the death benefit. This procedure additionally will ensure maximum payment for deaths occurring at a relatively young age.
Accordingly, the following guidelines will be followed in awarding death benefits. First, no payment will be made for death occurring at or after age 60. Second, for a veteran who died before January 1, 1985 at an age over 50, the payment amount will be reduced by one year's payment for each year of the veteran's age over 50 at the time of death. For example, if a veteran died in 1975 at age 55, based on currently available data his survivors would be eligible for an award of $1,700 ($3,400 minus $1,700). Third, for a veteran who dies after January 1, 1985 at an age over 50, the lump-sum award will be the total of the incremental payments for each year until the year the veteran would have turned 60, or the end of the payment program, whichever is earlier.

3. Variation in Awards Depending on Number of Subsequent Claims

Even after initial claims and questionnaires have been analyzed and a more detailed operational plan for the payment program has been prepared, the number and nature of future claims will remain uncertain. This uncertainty is one of the reasons the Special Master has recommended that both disability and death benefits be paid on an installment basis. The uncertainty must be taken into account in structuring a distribution plan.
(a) Disability Payments. The goal of the payment program will be to pay equal installments in each of the ten years of the program. If future claims increase unexpectedly, however, future yearly installment *1422 payments may have to be decreased below the target level set by the first year's payment. If they are less than expected, the court will determine whether to increase payments to claimants or pay the excess to the class assistance foundation in 1995 for the benefit of all members of the class. See infra Part IV.F.5. To make provision for this contingency, the following guidelines will be followed.
The target amount for all yearly payments will be the amount of the first yearly payment. The actual amount of each yearly installment will be fixed in the year before it is payable. It may be lower or higher than the target amount because claims analysis has shown that more or less future claims will be made than originally expected. The size of the next installment payable thus will be "guaranteed." Later installments will not be guaranteed, and may be decreased or increased if future claims are greater or less than expected.
(b) Death Payments. As indicated, death benefits will be payable in a lump sum rather than installments. Payments on future death claims will be subject to adjustment at the time of death, depending on whether more or less claims have been or will be made than anticipated. The target amount for calculating death benefits in any given year of the payment program will be based on the yearly increment used to compute death benefits the first year. The actual amount of each yearly installment will be fixed in the year before it is payable. The death benefit payable in subsequent years may be decreased or increased to account for an increased or decreased number of future claims. See infra Part IV.F.5.
(c) Lump-Sum Versus Installment Payments. Lump-sum awards for early death, unlike installment awards, cannot be adjusted in later years to account for a changed incidence of future actual claims as against predicted claims. The number of early death claims and the amount of the resulting death benefits payable, however, are relatively small. The change in disability installment payments and in late death claim payments to account for increased or decreased future claims therefore will be about the same whether death benefits are paid in a lump sum or on an installment basis.

4. Amounts Payable

The following table gives estimates of the total amounts that will be paid from the program to various categories of claimants. The calculations are based on the following assumptions: (1) 7,500 dead and 17,500 disabled as of the date of this opinion; (2) for those who have not filed claims as yet, incidence of subsequent deaths and disabilities that would be expected from the general male population of equivalent ages; (3) for those who have filed claims, a somewhat higher incidence of subsequent deaths and disabilities; and (4) ten percent annual interest return. The amounts shown as "total paid" include the original $150 million, plus interest earned over the life of the program, less administrative costs. The "maximum payment" is the maximum obtainable under all eligibility criteria and qualification factors based on present information. It is subject to adjustment up and down.

*1423
 TOTAL
 MAXIMUM AVERAGE TOTAL NUMBER PAID
 PAYMENT PAYMENT OF RECIPIENTS (Millions)
1. Disability Payment
(disability began before January
2, 1985) $12,800 $9,600 14,000 $134.4
2. Disability Payment
(disability began after January
2, 1985) $ 7,300 $2,400 16,800 $ 40.3
3. Total Disability $12,800 $5,700 30,800 $174.7
4. Death Payment
(death before January 2, 1985) $ 3,400 $3,400 6,000 $ 20.4
5. Death Payment
(death after January 2, 1985) $ 3,400 $1,000 12,100 $ 12.1
6. Total Death $ 3,400 $1,800 18,100 $ 32.5
 PROGRAM TOTALS $12,800 $4,200 48,900 $207.2

The total of $207.2 million is greater than the $150 million set aside for the program because of assumptions about interest rates and dates of payment. Variations in these factors will require adjustments up or down in the payments.

5. Disbursement of Any Excess Remaining at Program Termination

If the number of claimants subsequently found to be qualified under the eligibility criteria discussed above is less than estimated, more funds will be available for disbursement. The Special Master has recommended that any funds remaining at the end of the payment program be transferred to the endowment of the class assistance foundation to be administered on behalf of the class as a whole, particularly children with birth defects. As the Special Master has observed, "[t]he needs of children suffering from birth defects are enormous and long-lasting. Furthermore, as parents pass their prime income-producing years, their ability to care for adult children with birth defects diminishes." Special Master's Report, p. 177. It is even possible that birth defects may increase in frequency or severity in subsequent generations. Thus in the future there may be an even greater demand for assistance from the class assistance foundation than at present.
In light of these considerations, the Special Master's recommendation is both thoughtful and reasonable and is adopted. The court has ample authority to provide for such a transfer of funds between distribution programs. See, e.g., Curtiss-Wright Corp. v. Helfand, 687 F.2d 171, 174-75 (7th Cir.1982); Beecher v. Able, 575 F.2d 1010, 1016 (2d Cir.1978); Zients v. Lamorte, 459 F.2d 628, 630 (2d Cir.1972). The court reserves the right to provide for an upward adjustment of payments to claimants using some or all of any surplus that may develop. Under no circumstances will any funds revert to the defendants.

G. Means Test and Impact of Payment on Public and Private Assistance

A means test, by which applicants would be asked to supply information on their personal finances and access to other death and disability benefits, might seem to be a desirable method of extending the effective reach of the payment program by channeling compensation to those with the most need. The nature of our socioeconomic system, however, together with the probable cost of implementing such a requirement, makes a means test virtually impossible to administer. It may do more harm than good at great expense to the fund.
An enormous overlapping complex of benefits has grown up in our society, in part because of a desire to induce private initiative. The well-to-do undoubtedly may receive more than others: They may be *1424 compensated by special retirement and disability schemes of the government and private sectors, private insurance policies, Social Security disability benefits and have, in addition, substantial personal resources preventing economic deprivation. In contrast, the very poorest members of society are least likely to be able to protect themselves by private means or by exploring fully the maze of public benefits. The disparity is almost unavoidable.
Coordination of Agent Orange settlement awards with each applicant's personal resources and public benefits would require claimants to submit a great deal of private information. A substantial amount of administrative work to untangle the threads of collateral sources, including case-by-case determinations and review of numerous documents, would be needed. A means test thus would be both extremely difficult to administer and very costly. Moreover, such an approach would penalize those veterans who have managed to set aside resources. Accordingly, payment program awards will be made without regard to income or other resources.
There is reason to be concerned about the disadvantaged members of the class. Many class members receive welfare and other forms of need-based public assistance. Such programs may base the amount of benefits on a recipient's resources; they may seek to recoup past payments should a recipient's resources increase. See generally, e.g., Characteristics of State Plans for Aid to Families with Dependent Children (SSA Pub. No. 80-21235, 1984); Characteristics of General Assistance in the United States (HEW Pub. No. (SSA) 78-21239, 1978); Baldus, Welfare as a Loan: An Empirical Study of the Recovery of Public Assistance Payments in the United States, 25 Stan.L.Rev. 123, 125 (1973); Annot., 80 A.L.R.3d 772 (1977). The court has received requests from local welfare agencies and others that any payments to which the individual veteran or his family may be entitled be made to the agency.
Apart from the costs of recovering welfare payments, it seems manifestly unfair to permit welfare and other public assistance agencies to take payments from the Agent Orange settlement fund for past benefits conferred. As Professor Baldus put it:
Recovery may have been a justifiable policy in [the early 19th Century when recovery laws were first adopted], but today the social costs it generates far outweighs the budgetary savings and marginal social benefit it produces.
Baldus, supra, 25 Stan.L.Rev. at 135. See also id. at 125 n. 3.
The intent of the settlement and distribution plan is to provide financial help to alleviate some of the suffering of needy class members, not to reimburse state and local governments. A tort settlement, conceptually and in practice, is intended to compensate an individual for injuries to his or her person. Such a monetary recovery is neither income nor resource in the sense of realized gain. See, e.g., Grunfeder v. Heckler, 748 F.2d 503, 510-12 (9th Cir. 1984) (Ferguson, Schroeder and Alarcon, JJ., concurring). Payments from the settlement fund should, to the extent permitted by law, not be subject to recoupment by public assistance agencies.
The equities in future benefits are less compelling. As one judge put it:
[T]here is [a great] difference between denying eligibility for assistance to one with substantial assets in hand derived from a tort claim, and recovering assistance from a former welfare recipient who succeeds in receiving compensation for injuries. In the first case * * * the victim has the means of immediate subsistence a test of eligibility; if the recovery had been [small] instead of [large], he might still be eligible for aid. In the second, the attachment of a meager recovery can effectively destroy the means for future subsistence independence as well as remove the financial comfort given as compensation for physical pain. As a result, self-sufficiency may be jeopardized, and return to relief hastened.
Snell v. Wyman, 281 F.Supp. 853, 872 (S.D.N.Y.1968) (three-judge court) (Kaufman, *1425 J., dissenting), aff'd mem., 393 U.S. 323, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969).
Statutory grounds do exist for exempting settlement fund payments from consideration in determining eligibility for public assistance. Legislation to confirm such a result in the case of Agent Orange awards is desirable.
Conflicts between tort compensation principles and public assistance eligibility criteria have arisen most notably in the context of Aid to Families With Dependent Children (AFDC) programs. Section 602(a)(17) of title 42 of the United States Code, a part of the Social Security Act, governs ineligibility for AFDC payments resulting from receipt of nonrecurring lump sum income. It requires state AFDC plans to provide that if an AFDC recipient or certain family members receive in any month "an amount of earned or unearned income" that together with all other nonexcluded income exceeds the state's standard of need for the family, that lump sum will be considered income to that individual in the month received. The family will be considered ineligible for aid for a prescribed period of time. The nonrecurring lump sum income in effect is treated as a substitute for AFDC. The state at its option may provide for certain narrow extenuating circumstances. 42 U.S.C. § 602(a)(17) (as amended by the Deficit Reduction Act of 1984, § 2632, 98 Stat. 1141).
A strong line of authority holds that tort recoveries are not "income," earned or unearned, within the meaning of the AFDC lump sum rule. See Barnes v. Cohen, 749 F.2d 1009 (3d Cir.1984); LaMadrid v. Hegstrom, 599 F.Supp. 1450 (D.Ore.1984); Reed v. Lukhard, 591 F.Supp. 1247 (W.D. Va.1984); cf. Grunfeder v. Heckler, 748 F.2d 503 (9th Cir.1984) (Holocaust reparations payments not "income" for Supplemental Security Income (SSI) eligibility purposes).
This position treating recovery from a tort litigation as nonincome is not inconsistent with congressional design. The legislative history of section 402(a)(17) does not clearly define "income." See Barnes, 749 F.2d at 1016-17; LaMadrid, 599 F.Supp. at 1454-56; Reed, 591 F.Supp. at 1255-57; H.R.Conf.Rep. No. 861, 98th Cong., 2d Sess. 1400, 1410-12 (1984), U.S.Code Cong. & Admin.News 1984, p. 697. Tort recoveries are excluded from income under the Internal Revenue Code of 1954, as amended. I.R.C. § 104(a)(2). That Congress has not provided a special definition of "income" in the AFDC statute suggests a plan to use a definition paralleling that used in other federal laws such as the tax laws. LaMadrid, 599 F.Supp. at 1457-58; Reed, 591 F.Supp. at 1256-57; cf. Grunfeder v. Heckler, 748 F.2d 503, 506, 510-12 (9th Cir.1984) (majority and concurrence point to exemption of Holocaust reparations payments and tort awards generally from definition of income for tax purposes). But see Betson v. Cohen, 578 F.Supp. 154, 159 (E.D.Pa.1983) (absence of specific provision in AFDC statute similar to IRC § 104(a)(2) indicates Congress intended to include tort awards), rev'd on other grounds sub nom. Barnes v. Cohen, 749 F.2d 1009 (3d Cir. 1984).
Supporting the statutory argument is the fact that inclusion of personal injury recoveries as "income" under the AFDC lump-sum rule is contrary to the common meaning of the term "income," which includes the concept of gain. A tort recovery is not a gain but replacement of a loss. As the district court explained in LaMadrid:
A personal injury award does not increase the measurable worth of the individual receiving the award. * * * [A]n award for property damage is an award to replace something lost, like a car or a stove. A personal injury award likewise compensates a person for loss of a resource, whether it be a lost body part or loss of the ability to function in a certain manner. Compenastion for personal injuries functions to restore the recipient to the status she or he enjoyed prior to the injury. A personal injury award merely serves to make the person "whole" or to restore what was lost by the injury. There is not the measurable gain which is an essential part of the common definition of "income."

*1426 While no amount of money can actually replace a lost body part, the concept of damages has always been viewed as a way to make the injured party whole.
LaMadrid, 599 F.Supp. at 1456 (citations omitted). See also Barnes, 749 F.2d at 1017-18; Reed, 591 F.Supp. at 1256; cf. Grunfeder, 748 F.2d at 511 (concurrence discussing absence of gain from tort award).
Given these considerations, a strong showing should be required before it is concluded that Congress intended to subject personal injury recoveries such as those received from the Agent Orange settlement fund to the AFDC lump-sum rule. Recent decisions to the contrary generally have not addressed the specific issue of whether tort awards are "income" within the meaning of the AFDC statute. See Walker v. Adams, 741 F.2d 116 (6th Cir. 1984) (no discussion of issue); Sweeney v. Murray, 732 F.2d 1022 (1st Cir.1984) (no discussion of issue; no statement about whether personal injury award involved); Duckworth v. Miller, 127 Ill.App.3d 1088, 83 Ill.Dec. 214, 469 N.E.2d 1148 (1984) (no discussion of issue); Muckey v. New Mexico Department of Human Services, 102 N.M. 265, 694 P.2d 521, 526-27 (N.M.Ct. App.1985) (recognizing issue exists though not presented on appeal; tort award not involved). But see Littlefield v. Maine Department of Human Services, 480 A.2d 731, 739-41 (Me.Sup.Jud.Ct.1984) (personal injury award not income). Obviously, the matter is not free from doubt; should the matter of AFDC benefits arise in the context of an Agent Orange award, the particular case would require the kind of adversarial hearing not now possible.
A result favorable to the claimant, excluding compensation based on loss, has been reached in the context of need-based public assistance under SSI. See Grunfeder v. Heckler, 748 F.2d 503 (9th Cir.1984) (Holocaust reparations not to be considered in determining SSI eligibility). Personal injury recoveries, like reparations, have a "penitent purpose": they are designed to compensate for the "deprivation of personal rights." Id. at 508. The three concurring judges in Grunfeder in fact would have rested the holding in that case on the tort compensation character of the funds received. See id. at 510-12.
There are many need-based assistance programs at the federal, state and local levels, including veterans pension benefits. See 38 U.S.C. § 503; Peed v. Cleland, 516 F.Supp. 469 (D.Md.1981). A comprehensive solution to the dilemma faced by poor veterans and their families requires national legislation. Such legislation also could confirm the result reached in the instant case with respect to recoupment of past benefits. Surely this is the least our country can do for the Vietnam veterans who served it honorably and well, and who have gone so long without the thanks and recognition they deserve.
The Special Master is directed to bring this matter to the attention of appropriate legislative and executive bodies under the same restrictions as set out supra Part III.A with respect to birth defect legislation. In the interim, the court will make payment program benefits available on condition that no lien for a preexisting payment or agreement for reimbursement be recognized.
Similar problems may be experienced by class members in dealing with their private insurance carriers. Individual determinations of eligibility for cash compensation under the payment program may not be treated by insurance companies as affecting coverage of class members found eligible. First, the exposure test that will be used is deliberately overinclusive. See supra Part IV.D. It in no way serves as definitive evidence that a veteran was exposed to dioxin at all, much less that he or she was exposed to significant levels of dioxin. Second, the nontraumatic death or disability standard that will be used in lieu of a causation test also is deliberately overbroad. See supra Part IV.A. It may not be relied upon as evidence that a particular death or disability is causally related to war activities.
Thus there is no basis either for treating a class member claimant as a high risk because the exposure test has been met, or *1427 for invoking a "war related" clause in an insurance policy. Eligibility for payment program compensation may be given no weight in determining private insurance coverage.

H. Implementation and Operation of the Payment Program

Immediate steps are needed to implement the payment program even though payments to claimants cannot be made until appeals are completed. See also infra Part VII.

1. Administration by Private Contractors

The court lacks the capacity to administer the program. More appropriate institutions will be required to perform necessary professional and administrative services. First, the services of a claims processor or processors will be needed to receive and analyze death and disability claims, maintain records, conduct exposure and death or disability reviews, and make payments. Second, the assistance of actuaries, auditors, investment counsel, and management consultants will be required at various times. Third, expert assistance in drafting claim forms, exposure assessment, medical disability review, survey research and data processing may be needed. Fourth, experts will be needed to provide requests for bids and perform services preliminary to putting the program into operation.
The need for these professional and administrative services will be intermittent. If in-house staff were hired, the program would be understaffed during busy periods and overstaffed at other times. Use of outside contractors will provide high-quality services during very active periods, but preserve fund resources during less active times. In addition, outside contractors will be able to make a heavy commitment of resources during the first year, to assure prompt and effective implementation of the programs. The fund will avoid the unnecessary start-up and overhead costs of operating an in-house program.
Good business practices will be followed in procuring services from outside contractors. An open bidding process will be used to ensure that professional and administrative services are obtained at a competitive price. Although overly bureaucratic mechanisms should be avoided, the procedure must be sufficiently formal that any appearance of self-dealing or other impropriety is avoided.
Possible suppliers of services will be contacted by the Special Master. The requirements and constraints will be explained and proposals solicited. For any significant contract, bids will be sought from several providers. See also infra Part VII.C.1.
In selecting contractors the following specific criteria among others will be taken into consideration: ability to supply high-quality and cost-effective service without cost overruns; reputation, experience, expertise and reliability, including past record of delivering quality services on time and within budget; efficiency of operation; sophistication of organization and capacity to minimize bureaucracy and cost; and sensitivity to the concerns and special needs of class member claimants. The services required may be performed by one or several contractors. For example, for processing claims a large institution or consortium of smaller companies might be selected, depending on the advantages presented by their respective proposals. It may be advantageous to have the disbursing agency combined with or separate from the claims processor and investor of funds.
Providing for proper solicitation and bidding will require experts in the field of insurance. Subject to the court's control, the Special Master is authorized to contract with consultants for such service. It must be emphasized to the consultants that protection of the fund, maximum benefits to the class, and low-cost, efficient and high-quality service are prime desiderata. Precautions will be required to ensure that the disbursing or other contracting agency does not receive a windfall should approved payments fall below predictions.

2. Preparation of Application Forms

The preliminary claim form was designed to determine the initial number of potential *1428 claimants and solicit general information about them. It was not intended to elicit the detailed information about death, disability and exposure needed to implement the payment program. Additional data must now be obtained and analyzed. A first step will be to develop detailed application forms that will be sent to all claimants to determine which are eligible for payment.
The forms will be designed to determine whether a veteran meets class membership requirements, including Agent Orange exposure, and whether the veteran is dead or totally disabled. To determine exposure, the application will contain questions regarding the specific dates and locations of the veteran's Vietnam service and the veteran's job assignments in Vietnam. To determine whether death or long-term total disability criteria are met, the application will seek information about the veteran's medical condition, whether the death or disability was caused by traumatic, accidental, or self-inflicted injuries, and whether the Social Security Administration has classified the veteran as disabled. The forms will be designed specifically for efficient computer processing and analysis.
Experts will assist in drafting the application forms to ensure that necessary information on exposure and disability is elicited, and that computer coded forms are properly designed. It probably would be useful to have the contractor that will receive and pass on claims and make disbursements participate actively in the development of the application form. The completed draft application must be approved by the court.

3. Distribution and Return of Applications

After application forms are developed, they will be mailed to all claimants who will have filed a timely initial claim form. Eligibility criteria and payment levels cannot be finalized until data from claimants are received and analyzed. To minimize delay claimants will be given 60 days from date of mailing to complete and return the application. Assistance will be provided for claimants who have questions about completing the application. See infra Part VII.A.5. Claimants submitting late applications will not be entitled to receive payment for the first year, but will be eligible for payment in the second year.

4. Processing and Appeals

The procedure for processing applications set out below is illustrative only. Details will be modified on the basis of recommendation from the consultants and contracting agency or agencies.
The contract with the disbursing and any other contracting agency shall be arranged so that no greater profit is derived by it through rejection of claims, thus avoiding a conflict of interest. At the same time internal checks and auditing should ensure use of proper standards in passing on claims.
Once received, an application for payment ordinarily will go through a four-step claims review process: initial screening and data entry, exposure review, death and disability review, and issuance of payment to the qualified applicant. A computerized tracking system will monitor the progress of all application forms.
Applications will be checked for completeness. Then they will be screened to determine whether the applicant claims exposure and death or a qualifying disability. Basic information about the applicant and the claim will be entered into a computerized system that will track the application through the review process. This system will enable the claims review facility to respond to the applicant's inquiries about the application's progress and to report to the court on the number of claims received and their processing status.
Applications then will be analyzed to determine whether the veteran was exposed to Agent Orange. See supra Part IV.D. Those receiving a positive exposure finding will go forward for disability review. Claims based on nontraumatic death or Social Security disability will be verified quickly and sent on for check issuance. Claims without a verified death or Social Security disability finding will receive a *1429 disability review. Checks then will be issued to qualified applicants.
The full disability review process will use routine insurance industry procedures to determine medical eligibility for payment. Persons trained in applying medical criteria and disability guidelines will examine the applications and medical evidence to determine whether a long-term total disability exists. The claimant will be required to submit appropriate documentation, including a statement of diagnosis, relevant test results, and medical history. A doctor's statement of disability without explanation or objective medical evidence ordinarily will be insufficient. For example, the American Medical Association's Guide to the Evaluation of Permanent Impairment may provide guidelines for appropriate medical proof of impairment. The claim reviewers also may take into account evidence that the claimant is or is not deemed disabled under various other disability programs including Veterans Administration programs.
Claimants found ineligible for payment because of lack of total disability or absence of exposure will be entitled to appeal. A claimant would initiate the process by filing a written statement detailing the basis for the appeal. Assistance in filing appeals could be provided through existing outreach and veterans assistance organizations. See infra Part VII.A.5. The appeal will be heard by an independent reviewing authority. It will consist of one or more persons appointed by the court.
An appeal will be based on the written record unless the review board decides otherwise. The review board will determine the appropriate disposition with a brief written statement of its reasons. The decision will be final.

5. Benefit Calculation and Adoption of Final Payment Levels

After all eligibility screening is complete, an actuary will calculate benefit levels for each class of claimants based on age and duration of disability. See supra Part IV.F. Benefit level estimates set forth in this opinion are based on a series of factually based assumptions about the characteristics of the class members and the anticipated number of claims. Once the applications have been processed and analyzed, eligibility criteria may be adjusted. The precise benefit levels then will be calculated. The court will adopt final eligibility criteria and benefit levels and authorize the first disbursements. The Special Master shall expedite setting up the system so that first payments can be made before July 1, 1986, assuming that appeals have been completed by that time. See infra Part VII.C.1.

6. Annual Reviews and Continuing Eligibility Reviews

In addition to the claims review process, which will continue throughout the payment program, various annual reviews will be conducted to adjust program guidelines as future claims are filed. As claims experience is gained, the eligibility criteria and payment levels established in the first year may require modification.
Disability payments will be discontinued if a claimant recovers, dies, or reaches age 60. See supra Part IV.F.1.b. Disability claims will be reviewed each year for continuing eligibility. Claimants will be required to provide a brief statement of continuing eligibility in sufficient time to ensure timely check processing and disbursement.

7. Court Control and Reports to the Court

The settlement agreement in this case provides that the "Fund shall be maintained and administered by the Court and shall be under the Court's continuous jurisdiction, control and supervision to assure that the Fund shall earn the maximum interest consistent with safety and that all disbursements are properly made." In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 864 (E.D.N.Y.1984). Rule 23(e) of the Federal Rules of Civil Procedure additionally imposes a responsibility on the court to protect the interests of all class members by ensuring that the class settlement fund is distributed equitably. *1430 See supra Part II. Particularly because the class is large and diverse, the court must continue to supervise distribution until the fund has been disbursed. Thus this court must exercise continuing control over the assets and disposition of the settlement fund.
Each contracting agency will forward a report to the court at the end of each year in which it supplied services. The report shall be designed to provide detailed information on the financial status of the payment program. The report of the appropriate contracting agency shall recommend the appropriate benefit levels for the next year and set forth the analysis of claims received and projected requirements for compensation of future claimants on which payment level calculations are based. After reviewing the report, and consulting the administering institution as necessary, the court will adopt payment levels for that coming year. See supra Part IV.F.
The annual stockholders' report of the administering institution or its equivalent and such other reports as the court may request will be provided to the court as soon as available. An independent audit will be conducted annually. See infra Part VII.C.4. Significant unexplained accounting irregularities, unreasonable administrative cost overruns, fraud, breach of fiduciary responsibilities and similar occurrences will be considered material breaches of the contract to administer the payment program. The court reserves the right to terminate any contract if its responsibility to protect the interests of the class so requires.

8. Veterans Advisory Group

The court will promptly appoint an advisory group of Vietnam veterans that will be consulted in the planning and development of the payment program. Many class members have expressed the view that veterans should have a significant role in the distribution of the settlement fund. See, e.g., In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 858 (E.D.N.Y.1984). The veterans' sensitivity to the needs of their fellow class members may be valuable in structuring the payment program. The advisory group's views will be solicited on the following matters, among others: bidding procedures; selection of contractors; selection of auditors; development of application forms and an information program; and operation of the payment program. Members of the advisory group will receive no compensation beyond reimbursement of out-of-pocket expenses.
Members of the advisory group may be appointed to the initial board of directors of the class assistance foundation. See infra Part V.B.2. Alternatively, veterans may be appointed to the advisory group whose professional expertise would be of particular value in operating the payment program, but who will not be members of the foundation board of directors. Some overlap probably is desirable, to facilitate exchange of information of interest to both groups. See, e.g., infra Part VII.A.

I. Private Attorney Fee Arrangements

The payment program shall be designed to minimize the need for expensive legal assistance by simplifying the quantity and nature of the documentation that a claimant must submit to support his or her application for payment. With the possible exception of the applications of claimants seeking full independent disability review, see supra Part IV.H.4, no legal expertise or special skill of any kind should be needed to complete a preliminary claim form or application for payment, or to obtain military records or records relating to findings of disability or cause of death. The institution or institutions selected to administer the payment program will so far as possible assist claimants in completing payment applications and obtaining necessary records. See infra Part VII.A.5.
A number of class members filing claim forms have indicated that they are represented by counsel. Some of these attorneys may seek to enforce fee agreements with disabled veterans and with families of deceased veterans who are eligible for payments from the program.
*1431 The court has already awarded attorney fees and expenses payable from the settlement fund for lawyers' work that benefited the class by contributing to the creation of the fund. See In re "Agent Orange" Product Liability Litigation, 611 F.Supp. 1296 (E.D.N.Y.1985). All class members, whether or not represented by other counsel, were found to be subject to pro rata assessments of the overall fee award against their respective shares of the class settlement. Id., 611 F.Supp. at 1316. Each class member claimant therefore has already paid for all legal work from which he or she received any benefit:
In the instant litigation, it is clear that any benefit received by a class member resulting from the creation and distribution of the settlement fund arises from efforts by the relatively few attorneys receiving fees for time spent in prosecuting the class action. * * * The efforts of any other lawyer on behalf of an individual class member client at best contributed less than marginally toward any recovery ultimately to be received by that class member from the fund.
Id. 611 F.Supp. at 1316.
The only other activities of lawyers that arguably benefit a class member claimant receiving a payment program award are the filing of a preliminary claim form, the completion and submission of an application for payment, and the assembling and forwarding of military and medical records. These routine clerical tasks are not the sort of work for which a lawyer should obtain a substantial fee. See, e.g., Allen v. United States, 606 F.2d 432, 436 (4th Cir.1979); Hoffert v. General Motors Corp., 656 F.2d 161, 165-66 (5th Cir.), reh'g denied, 660 F.2d 497 (1981), cert. denied sub nom. Cochrane & Bresnahan v. Smith, 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982); Krause v. Rhodes, 640 F.2d 214, 218-20 (6th Cir.), cert. denied sub nom. Sindell, Lowe & Guidubaldi v. Attorney General of Ohio, 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981); Dunn v. H.K. Porter Co., Inc., 602 F.2d 1105, 1109-10, 1112 & n. 9 (3d Cir.1979); ABA Code of Professional Responsibility DR 2-106(A), (B).
The court reserves the right to review private fee arrangements and void or modify them when unreasonable. This power and responsibility arises under Rule 23(e) of the Federal Rules of Civil Procedure and the court's supervisory authority over counsel. Dunn, 602 F.2d at 1108-10, 1114. It is the law of the case that "[t]he only fee or expense award recoverable from the settlement fund or a class member's individual recovery is one awarded * * * by * * * court order." In re "Agent Orange" Product Liability Litigation, 611 F.Supp. 1296, 1317 (E.D.N.Y.1985).
Claimants of course have the right to retain counsel to file their applications for them, however routine the work involved may be. Attorneys who are thus freely retained are entitled to be paid. But fees for such mundane clerical tasks must be modest to be reasonable. Counsel fees accordingly will be subject to court supervision and control. Guidelines for reasonable fees will be set as necessary once the payment program has been implemented and exact eligibility criteria and payment levels are known. Payment program application forms should include information on court supervision of attorney fees. Clear instructions and help in filling out the forms will be provided to minimize the need for legal assistance. See infra Part VII.A.5.

V. CLASS ASSISTANCE FOUNDATION
The majority of claimants will not meet the eligibility criteria for cash compensation under the payment program. Nevertheless many of these claimants may have health problems and other needs. They should receive some benefit from the settlement. Distribution of thousands of small individual payments would trivialize the beneficial impact of the settlement fund on the needs of the class. The most practicable and equitable method of distributing benefits to this segment of the class is through funding of services. See supra Parts II, III.D, and III.E, and Introduction to Part IV.
*1432 The Special Master has recommended as a second major distribution program that a class assistance foundation be established to fund projects and services that will benefit the entire class. See Special Master's Report, pp. 151-228. This recommendation as modified below is adopted.

A. General Framework

The fairness opinion discussed many of the suggestions for disposition of the settlement fund that were made at the Fairness Hearings and in other submissions to the court. In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 85861 (E.D.N.Y.1984). Among these were suggestions that funds be set aside to aid children with birth defects born to class member veterans, and that a national center for Vietnam veteran assistance be established to provide Vietnam veterans and their families with "a visible, central source of legal and political power." Id. at 859.
Maintaining a large part of the fund for a class assistance foundation will serve many purposes. The foundation can serve as a national focus for Vietnam veterans who are class members to mobilize themselves and others to deal with their medical and related problems. Because the foundation will direct the spending of a large pool of money to fund services, it will have a greater impact on the problems of the class than if thousands of small, individual payments were made. In addition, the foundation will provide class members with leverage in seeking to make public and private institutions more responsive to the medical problems of the class. The foundation should be in a position to obtain matching and other grants and contributions from private and public bodies. It will have considerable leverage to obtain medical and related assistance from existing organizations for members of the class.

1. Funding Priorities

Children with birth defects born to class member veterans should receive special consideration from the foundation. Over 60,000 children are estimated to have had claims filed on their behalf alleging birth defects and health problems resulting from their fathers' exposure to Agent Orange. Even though no currently available scientific evidence establishes any causal link between exposure of veterans to Agent Orange and any birth defect, the desirability of alleviating the suffering of these children and their families is compelling. In addition, the sentiment has repeatedly been expressed to the court that a plan for disposition of the settlement fund should promote harmony and unity within the class rather than create discord and divisiveness. Class members and veterans group representatives who have made their views known to the court generally agree that something should be done to aid the children with birth defects and their families. See, e.g., In re "Agent Orange" Product Liability Litigation, 597 F.Supp. at 76566, 860. Helping meet the needs of these children and their parents should be one of the main priorities of the foundation.
The various distribution proposals and other submissions to the court also demonstrate widespread support for the establishment of legal and social service projects to benefit Vietnam veterans exposed to Agent Orange and suffering some disability and their families. The second major priority of the foundation therefore should be to help meet the medical and related social service needs of the class as a whole.
Under the Special Master's proposal, $30 million would be allocated to a children's fund, which would issue grants, contracts and other awards to benefit children with birth defects. Another $30 million would be used to establish a service fund, which would issue grants, contracts and other awards to help meet the service needs of the entire class. Special Master's Report, pp. 151, 155, 178-89. Under the court's plan, over $45 million will be allocated to the foundation. This endowment will be administered as a single fund, rather than as two separate funds, allowing greater flexibility in performing the foundation's designed functions.

2. Funding Structure

A general objective in distribution is to minimize administrative costs so that the *1433 settlement fund is conserved and the benefit to the class is maximized. There should be no elaborate bureaucracy. Quality volunteer assistance should be sought in all aspects of administration. Settlement funds should not be used to duplicate existing services.
These principles also apply to the activities of the class assistance foundation. Numerous existing organizations, some with general mandates and others dedicated to veterans only, are currently helping to meet the medical and related service needs of the class. Many provide high quality services but lack the resources to meet class demands. The foundation cannot afford to duplicate already existing services nor should it create a new bureaucracy to fill service gaps. Rather than provide services itself, the foundation should fund the expansion of existing projects and encourage the creation of new projects to help meet class needs. The foundation thus will take advantage of groups that have already developed expertise and will explore new ways to benefit the class.
The foundation may fund projects that directly benefit individual claimants as well as projects that help the class in general. Foundation funds need not be limited to existing organizations. Seed grants can be provided to create new institutions to serve this class. The foundation should encourage existing service organizations that do not yet focus on the Vietnam veteran community to develop new services for the class. The foundation also may help individual class members in dire financial need by issuing emergency grants or loans.
The class assistance foundation can structure its funding in many different ways. It could, for example, (1) enter into fee-for-service contracts with existing facilities; (2) issue annual grants to organizations to expand their existing projects; (3) provide seed monies to existing groups to help start new projects; (4) issue challenge grants to spur donees to find funding from other sources; (5) issue matching grants to augment funding from other sources; or (6) fund cooperative ventures with other institutions in collective projects. Thus, as a funding rather than service organization, the foundation could extend the reach of its initial endowment, increasing the impact of its program on class problems.

3. Persons Who Should Receive Services

Projects funded by the foundation should be designed to benefit the class of persons whose claims are covered by this settlement. See In re "Agent Orange" Product Liability Litigation, 100 F.R.D. 718, 729 (E.D.N.Y.1983), mandamus denied, 725 F.2d 858 (2d Cir.), cert. denied, ___ U.S. ____, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984), quoted supra Part I. Funding should be directed to projects that focus on this class rather than on society as a whole or on the general veteran population, even though indirect benefits may flow to this broader group of veterans and family members from the foundation's activities. Some worthwhile projects may not be able to deliver services exclusively to members of the class, but efforts should be made to inform and encourage class members to participate in foundation-funded projects. In addition, the claimantsthose class members who have filed or will file a claim to participate in the settlementshould be the initial focus of projects that provide intensive services to individuals.
Because the foundation forms a part of the distribution plan in this class action, it must require those wishing to use foundation-funded services to prove exposure to Agent Orange in Vietnam. See supra Parts I and IV.D. The exposure requirement need not be the same as that used by the payment program. The burden of administering an exposure test as stringent as that of the payment program would be far greater for the foundation, which will be funding services for the entire class. Interposition of a strict exposure requirement would seriously impede the prompt and efficient provision of services to class members. The foundation thus will be permitted to devise appropriate exposure criteria in light of its mandates and funding priorities. These may include a presumption similar to that used by the Veterans *1434 Administration. See 50 Fed.Reg. 15,853 (1985) (to be codified at 38 C.F.R. § 3.311a(4)(b)). The exposure test proposed by the foundation will be set forth in the comprehensive plan to be submitted to the court by the initial board of directors. See infra Part VII.C.2. The proposed criteria will be subject to court approval.
Many members of the class are outside the mainstream of society. The foundation in issuing grants or entering into contracts should make efforts to see that funded services reach these people and their families. The special needs of incarcerated veterans, those facing language barriers, those living in rural areas or on Indian reservations, and those who are isolated from their communities should be considered in reviewing grant applications or contract offers. The foundation should make a concentrated effort to fund projects that will reach this often forgotten segment of the Vietnam veteran community. See also infra Part VII.A.1.
Children born on or after January 1, 1984 are not members of the class. The settlement agreement states that these afterborn children may elect to receive benefits from the distribution of the settlement fund but that such an election by them or on their behalf waives their right to sue the seven defendant chemical companies for injury from Agent Orange exposure. See In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 864-65 (E.D.N.Y. 1984). The court has made no ruling on the enforceability of this implied waiver. An afterborn child who does not seek benefits from the fund is not bound by the settlement agreement. See also infra Part VII.A.1.

B. Governance

1. Tax-Exempt Status and Organization in Perpetuity

A basic theme heard during the Fairness Hearings was that class membersVietnam veterans and their familiesshould have a significant role in the implementation of any plan for disposition of the settlement fund. See In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 858 (E.D.N.Y.1984). The class assistance foundation affords veterans the unique opportunity to mobilize themselves and others to deal with the enormous problems of the class. Because Vietnam veterans are the most sensitive to the needs and desires of the class, Vietnam veterans whether or not they claim exposure to Agent Orangeto the greatest extent possible should govern the foundation.
To facilitate class governance of the foundation, the foundation will be organized as a not-for-profit, tax-exempt entity in perpetuity. The Special Master has had extensive analyses of the issues involved prepared with the aid of volunteer lawyers who generously donated their services. See Special Master's Report, pp. 421-93. The pro bono efforts of Lani Adler, Esq. of O'Melveny & Myers and William B. Bonvillian, Esq. of Brown, Roady, Bonvillian & Gold were particularly helpful.
The foundation will have a board of directors, which will implement the foundation's mandate. Creation of a perpetual organization will give class members an entity that can help meet class needs beyond the 25-year term of the settlement agreement, especially the long-lasting needs of children suffering from birth defects.
Tax exempt status will increase the amount of money available to the foundation for grants to assist the class. Charitable tax status should be considered for the foundation as well. Status as a charitable organization under section 501(c)(3) of the Internal Revenue Code would enable it to obtain charitable contributions tax deductible to the donors.

2. Board of Directors

The court will appoint the initial board of directors to govern the foundation. The initial board will have between 15 and 45 members and will be comprised primarily of Vietnam veterans. The board membership will reflect a cross-section of the veteran community, cutting across social, gender, economic, geographic and occupational lines. To the extent possible, individuals *1435 will be appointed whose experience will be of particular help in implementing the foundation's program. For example, the board may include a health care professional familiar with birth defects, a social service professional familiar with family counseling services, and an attorney with experience in providing legal aid to veterans. Board members will serve without compensation except for reimbursement of reasonable expenses.
Once appointed, the board will be self-governing and self-perpetuating. Terms of service, mechanism for succession, and size of the board will be established in the corporate bylaws, subject to the initial board's approval.
The board will control every aspect of foundation administration, subject to the responsibilities retained by the court. See infra Part V.C.1. It will establish its own internal organization and procedures, including scheduling of meetings and issuance of regular reports. Because of its size, the board should form a number of standing committees and an executive committee to which certain areas of responsibility could be delegated to conduct foundation business more efficiently and effectively. These committees could schedule their own meetings and issue reports to the board for full board action. The Special Master will assist the board as necessary during the initial stages of implementation to establish such internal mechanisms.
The board will determine such matters as investment and budget decisions, specific funding priorities, a detailed grant application process, the actual grant awards, evaluation mechanisms, and fundraising strategies. The board will be responsible for preparation of annual budgets, annual audits, and other financial reports for the foundation, and for submission of these reports to the court for review. See infra Part V.C.1. As part of this review, the court may obtain a further independent audit. See infra Part VII.B.4.

3. Executive Director

The board of directors will be running a foundation with an endowment of over $45 million and an ambitious agenda over the next quarter-century. It should be assisted by someone having extensive experience with foundations or other charitable institutions and knowledge about organizations that may be able to provide services to class members.
Accordingly, the court will appoint a committee to search for such a person to serve as executive director of the class assistance foundation. The search committee will be comprised of prospective members of the initial board of directors. The court will consult the committee and review its recommendations before appointing the initial executive director.
Because a highly capable individual with a great deal of expertise is needed, a competitive salary will be offered. The executive director will report to the board and may be discharged by the board. Any successor to the initial executive director will be named by the board. If deemed necessary by the board, the executive director may retain additional professional and other help.
The executive director's responsibilities should include: (1) helping to define the foundation's funding priorities; (2) soliciting grant applications and contract offers and preparing requests for proposals; (3) evaluating the grant applications and contract offers; (4) recommending projects for funding for board approval; (5) monitoring the projects funded to ensure that the grantee or the contractor is meeting the needs of the class; and (6) developing mechanisms to leverage the foundation's endowment to increase its ability to meet the needs of the class.

C. Funding and Disbursement

1. Court Supervision of Disbursement

As already pointed out supra Part IV. H.7, the terms of the settlement agreement and the responsibility imposed by Rule 23(e) of the Federal Rules of Civil Procedure require the court to exercise continuing control over the assets and disposition of the settlement fund until all funds have *1436 been disbursed. A comparatively modest supervisory role in the operation of the class assistance foundation will satisfy these mandates.
All of the money remaining in the settlement fund after the payment program and foreign distribution plans are funded will be allocated to the foundation. Thus the foundation will have an initial endowment of over $45 million, as a single fund, rather than as two separate children's and service funds. See supra Part V.A. This fund may be increased by court order should experience with the payment fund permit transfers. See supra Part IV.F.5.
The Special Master has recommended that the court retain control over the foundation's endowment and its investment for the entire 25-year life of the foundation's program. As stated in this and earlier opinions, class members should have as substantial a role as possible in the governance of the distribution plan. Accordingly, once the foundation is fully operational, the initial endowment will be transferred to the foundation. The board will be responsible for all further investment and budget decisions. Richard J. Davis, Esq., the Special Master for Investment Policy appointed by the court, who is providing his services without fee, will be available for initial consultation.
The board will submit detailed annual budgets, biannual budgetary status reports, and biannual financial and investment statements to the court for review. The court will retain jurisdiction over the foundation and its endowment and will have the power to intervene. The court will retain the power to supervise foundation operations actively and will exercise control as necessary to protect the interests of the class. The court may request further information from the board regarding foundation operations as necessary to carry out its obligation to the class.
This oversight mechanism will enable the court to fulfill its mandated responsibility to supervise all disbursements of the settlement fund. It allows the board of directors to make all procedural and substantive decisions necessary to run the foundation, including investment of the endowment, establishment of funding priorities and the actual awarding of grants.

2. Rate of Payout and Future Needs

The Special Master's Report discusses the need to balance the competing goals of quick disbursement of significant funds to meet immediate needs versus modest payout in the early years to maintain a substantial endowment for future needs. In resolving this conflict, the Special Master recommended that the board of directors be allowed to invade the corpus of the initial endowment as the board deems necessary to fund projects. See Special Master's Report, pp. 178-95. More money thus would be available to meet the current needs of initial claimants.
Although the Special Master's recommendation is not unreasonable, the court believes that a greater emphasis on meeting future needs is appropriate. Accordingly, the foundation's endowment will be preserved for the first ten years of the foundation's existencethat is, until December 31, 1994and no invasion of corpus will be allowed, except by court order on recommendation of the foundation's board. Only interest and earnings from the initial endowment, plus private and public contributions, will be used to fund projects during the first ten years, unless court permission to invade corpus is sought and obtainedfor example, if an invasion of corpus is necessary to preserve the foundation's tax exempt status.
Under the Special Master's proposal to establish two separate funds to be administered by the foundation, the children's fund endowment was to be disbursed in 25 years. The service fund endowment was to be disbursed in ten years, on the grounds that the service fund should focus on the "more immediate legal and social service needs of current and future claimants." Special Master's Report, p. 188. The prohibition on invasion of corpus for ten years undercuts the suggested ten-year lifetime. The absence of a reason to set different operational periods for the two *1437 funds is a further basis for allocating the entire endowment of the foundation to a single fund covering both mandates.
The foundation fund will have a lifetime of 25 years, the term of the settlement agreement. Assuming a ten percent return on investment, about $4.5 million will be available annually to the board of directors for the first ten years to fund services. Any money raised by the foundation will be added to this amount and will not be subject to limitations on invasions of corpus. For the remaining 15 years, the board may invade corpus, so that the entire endowment including interest and earnings, but excluding the indemnity reserve discussed below, is disbursed by the end of the 25th year. The rate at which corpus is invaded during the 15-year period will be determined by the board. The requirement that the initial endowment be disbursed in 25 years does not mean that the foundation could not issue grants that provide for services and programs that will remain in operation past the end of the 25-year period.

3. Indemnity Reserve and Payout of Balance of Endowment Remaining After Twenty-Five Years

The settlement agreement provides that the settlement fund "shall indemnify * * * defendants * * * for all final compensatory judgments (excluding settlements), exclusive of costs and attorneys' fees, rendered against any of them in all state-court actions alleging harm caused by exposure to Agent Orange in or near Vietnam, not to exceed an aggregate amount of $10 million." In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 864 (E.D.N.Y.1984). Thus $10 million must be kept in reserve to indemnify the defendants until May 7, 2008.
The indemnity obligation will be borne by the class assistance foundation rather than the payment program, since the latter will not be in existence for the entire 25-year indemnity period, and an indemnity obligation would unduly hamper its operation. Accordingly, $10 million of the foundation's endowment must be set aside as an indemnity reserve, and the board of directors may not disburse these funds for any other purpose during the 25-year period of the settlement agreement. The interest and earnings from the $10 million reserved will be available for the entire 25-year period to be used by the foundation to fund services for the class.
The settlement agreement stipulates that "[a]fter 25 years from the date of this agreement, any balance remaining in the Fund shall be disposed of in such manner as the Court may direct." In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 864 (E.D.N.Y.1984). A substantial balance is likely to remain at the end of that 25-year term because most, if not all, of the $10 million reserved to indemnify the defendants probably will still be intact. Any such remaining balance will be transferred to the class assistance foundation to continue its work so long as the foundation deems necessary, particularly the funding of services addressed to the needs of children in the class suffering from birth defects. Money obtained by the foundation through fundraising, of course, may also be used by the board of directors to further the foundation's mandate in perpetuity. See infra Part V.F for further discussion.

D. Mandates and Goals in Funding Services

The broad mandates of the class assistance foundation are twofold: first, to fund projects to aid children with birth defects and their families and alleviate reproductive problems; and second, to fund projects to help meet the service needs of the class as a whole. See supra Part V.A. The board of directors will adhere to these broad mandates and will develop funding priorities and award grants to further these mandates. The board will make all decisions about specific funding priorities on a fully independent basis, including the relative emphasis to be given to each of the broad mandates.
The Special Master's Report contains a number of thoughtful recommendations with extensive accompanying discussion for *1438 the guidance of the board of directors in carrying out its mandates. See Special Master's Report, pp. 196-216. This Section will summarize the points made in the Special Master's Report, for the board's consideration.

1. Possibilities for Funding of Birth Defect and Reproductive Problem Programs

Repeated suggestions were made at the Fairness Hearings that programs be funded to aid children with birth defects born to class member veterans. Among the goals suggested to the court were the following:
encouraging research concerning birth defects, monitoring research to determine if causal connections can be scientifically verified, and making single or annual grants to assist families with children with birth defects. Such assistance could include, to the extent that funds are available, payment of medical expenses, vocational training, scholarships, and special costs of care and help to ameliorate the difficulties of this portion of the class. Financial and social needs of the family would be appropriate criteria for eligibility.
In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 861 (E.D.N.Y. 1984).
A primary goal of the class assistance foundation accordingly should be to issue grants or contracts for projects that will help children with birth defects lead a more normal life and will ease the heavy burden on the families of these children. A broad definition of the term "birth defect" should be used. Special Master's Report, p. 197 n. 70. A second major goal would be to fund projects to meet the service needs of those couples suffering from reproductive problems, including miscarriage-related problems and fear of parenting because of the veteran's exposure to Agent Orange.
(a) Maximizing Access to Existing Services and Provision of Family Support Programs. Many children with birth defects have enormous long-lasting needs for medical treatment and health care. The foundation cannot afford to provide medical treatment to all of these children, nor could it single out particular defects for limited treatment without large administrative costs and great controversy within the class. The most beneficial service the foundation can afford to provide would be to help these children and their families take advantage of existing private and public resources. Many existing health care and social service resources are underutilized because people who could use these resources are unaware of their availability and do not know how to find out what services are available.
Accordingly, priority should be given to funding projects that will maximize access to existing health care and social services for these children and their families. Professor Rand E. Rosenblatt, a health care expert appointed by the court pursuant to Rule 706 of the Federal Rules of Evidence, suggests that "the most effective ways to meet a wide range of unmet needs [are] coordination of care * * *, advocacy, and strengthening the family's capacity to deal with the stresses of major childhood illness and disability." Special Master's Report, pp. 511-12. Programs that would further this care coordination approach might include some of the following.
(1) Case management services. Skilled health professionals could train a family to deal with their child's health problem and work with health care providers and benefit programs to help improve care and benefits.
(2) Protection and advocacy services. Skilled advocates could provide numerous services, including ensuring accurate diagnoses and treatment, improving placements in special education programs, securing appropriate vocational training, establishing family support groups and educating parents, assisting in applications to benefit programs, helping solve housing and transportation problems, and securing community-based living arrangements for institutionalized children.
(3) A public hotline and referral service. Such programs could help families locate *1439 the most convenient and appropriate treatment and social service centers.
(4) Grants to hospitals and clinics. This money might assist families, especially those in isolated rural areas, in defraying travel costs incident to a child's medical treatment.
(b) Additional Projects and Emergency Financing for Medical Services. Although maximizing access to existing health and social services would be a first priority, to the extent feasible financially and technically the foundation also could fund programs to help meet the medical, educational, vocational, social and other needs of children with birth defects and their families. As the Special Master pointed out, "[i]n many cases, especially as these children grow older and their medical problems become stabilized, needs will change, and the demand for care coordination may decrease." Special Master's Report, p. 202. Potentially beneficial programs not strictly involving care coordination might include some of the following: (1) affordable, innovative insurance programs for these children; (2) special education grants to help devise new techniques to teach children with learning disabilities; (3) grants to an existing scholarship fund or educational loan program to provide financial assistance for these children, so that they can pursue higher education; (4) grants to establish peer support groups to enable children with birth defects to discuss their problems openly among themselves; (5) vocational training projects, perhaps in cooperation with targeted industries, to provide an opportunity for specialized job training; and (6) limited, focused research to develop new treatment techniques, medical services, and diagnostic tests.
In addition to funding projects, the foundation could set aside a special account to meet emergency needs of children with birth defects and their families. Grants or loans could be provided to families in grave financial need to help pay for essential medical services. These limited emergency grants could be used to help defray the costs of essential medical devices, emergency surgery, or life-sustaining drugs, among other necessary services.
(c) Reproductive Problems and Genetic Counseling. The reproductive problems of the class fall within the foundation's mandate. Some class members have stated that they are reluctant to have children because they fear that exposure of servicemen to Agent Orange will result in genetic damage in their offspring. Tens of thousands of claims have been filed for miscarriages said to be related to Agent Orange. The foundation should consider financing programs for genetic counseling of couples concerned about their future children as well as projects to help couples cope after a miscarriage occurs.
A survey of genetic counseling centers has been made to determine the availability of genetic counseling services for the class. See Special Master's Report, pp. 531-73. The survey contains valuable information on the availability and cost of services, but also highlights the major problem involved in providing classwide genetic counseling: Because no currently available scientific evidence links Agent Orange to any discrete birth defect or combination of birth defects, genetic counselors cannot tell class members what Agent Orange "causes," nor can they reassure them that Agent Orange exposure is harmless. Many Vietnam veterans seeking an explanation for their children's birth defects are frustrated because current genetic counseling services cannot provide definitive answers.
Nevertheless, genetic counseling may have some value for those couples who are still considering having children. A standard genetic counseling session may be of help to potential parents, even though the impact of Agent Orange exposure cannot be assessed. In addition to educating potential parents about general risks of birth defects, genetic counseling services will review family history and assess the particular risks of childbearing for a given couple. The value of such services to class members, however, will decrease in the relatively near future as more and more women in the class grow too old to have children.
*1440 In addition, counseling services and support groups could be funded for class members who have become emotionally distraught in the wake of a miscarriage. The foundation also could fund projects to develop new techniques for counseling couples suffering from reproductive problems they believe are related to Agent Orange exposure.

2. Possibilities for Funding of Classwide Services

The classwide service program concept originated in the suggestions made to the court during the Fairness Hearings that a national center for Vietnam veterans assistance be established. Such a national center, it was suggested, could perform the following:
provide legal assistance concerning claims against the Veterans Administration; undertake litigation to compel agencies of the government to comply with the law and assist Vietnam veterans; seek further legislation in the Congress and state legislatures to improve the lot of the Vietnam veteran; mobilize lawyers, doctors, and the business and education communities to help Vietnam veterans and their families; encourage research and training for the medical profession in treating Vietnam veterans and their families; and undertake such other activities, including counseling and veteran advisory services, as will assist the Vietnam veterans and their families.
In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 859 (E.D.N.Y. 1984). Other related possibilities suggested to the Special Master include outreach efforts to all class members, public education and awareness, vocational training and educational assistance. Special Master's Report, p. 152.
The primary goal for funding of classwide services would be to issue grants or contracts for projects that will help meet the medical and related social service needs of Vietnam veterans and their families. This method of providing services differs from the national center idea originally suggested to the court in that the class assistance foundation will fund programs through grants or contracts, whereas the national center was conceived of as an actual supplier of services.
Though many in the class need health care and medical treatment, the government is responsible for providing such treatment and care for the veterans through the Veterans Administration. See supra Part III.A; 38 U.S.C. § 610. The foundation, however, could fund projects to help class member veterans better obtain and utilize VA services and to monitor the VA and other federal and state services to ensure that they are responsive to the needs of the class.
In addition to advocacy and monitoring projects that oversee operation of government programs, the foundation could finance projects to (1) increase public awareness of the problems of the class; (2) provide health information to the class; (3) give social service assistance to the class; and (4) help members of the class become a more integrated part of society. Programs funded by the foundation could serve as visible symbols, much like the Agent Orange litigation itself, around which class members can organize to help themselves.
The issuance of grants or contracts for lobbying of federal and state legislatures should not be undertaken by the foundation. One of the strengths of the existing network of veterans organizations is its collective lobbying ability. Funding of lobbying could duplicate existing efforts and might lead to friction with the existing veterans lobbying network. The foundation should not expend its endowment on lobbying, particularly when many other service gaps exist that need to be filled. Lobbying might well impair the foundation's tax status. I.R.C. § 501(c)(3)-(4).
(a) National Vietnam Veterans Advocacy Center. Witnesses at the Fairness Hearings, a number of distribution proposals submitted to the court, and suggestions received by the Special Master have called for the establishment of a national legal center to help veterans exposed to Agent Orange. Although existing organizations already engage in extensive legislative lobbying *1441 efforts at the federal and state levels and provide individual counseling to veterans about their rights, it was felt that an additional need exists for a national legal center that will work for increased Vietnam veteran benefits through litigation and formal administrative proceedings.
Given the level of funding provided, supporting such a legal center seems impracticable. The primary focus of the foundation must be on medical and related problems. Nevertheless, in obtaining medical services for the class, legal problems and litigation needs may arise. The foundation is therefore authorized to issue grants or enter into contracts with existing organizations to provide advocacy services through a national Vietnam veterans advocacy center or a network of centers. Funds might be used to help pay the costs of test cases of particular interest to the class or individual class members and to provide medical advocacy to help educate members of the class about VA and other health care programs, increasing their understanding and ability to take advantage of available health services.
The foundation could extend its funding to provide these services in many ways. For example, much of the individual legal assistance could be obtained by contracting with law school clinics, using senior law students who would receive academic credit rather than cash compensation for their services. A grant could be given to an existing organization to help coordinate and organize pro bono activities by the private bar for class members.
(b) National Hotline and Referral Service, Agent Orange Information Clearinghouse, and Public Education Programs. The Special Master's suggestions about a national hotline, referral service, Agent Orange information clearinghouse and public educational services also were made by others. See Special Master's Report, pp. 211-15, 574-90 on funding of specific programs. The limited funds available may require giving such projects a low priority.
(c) Other Projects. In addition to the programs already discussed, to the extent feasible financially and technically the foundation could provide grants or contract for services to meet the health, educational, vocational and psychological needs of the class members who have filed claims with the settlement fund. Claimants who are not eligible for the payment program, but who suffer from significant partial disabilities or other serious health problems, should receive special consideration. See Special Master's Report, pp. 215-16.

E. Grant and Contract Procedures

The board of directors will be responsible for developing an agenda of priorities and a detailed set of regulations to govern the grant application process and other aspects of the foundation's operations. In developing an agenda and rules, the board will need to work closely with the executive director and such professional consultants, including physicians, lawyers and accountants, as it deems desirable.

1. Development of Specific Funding Priorities

Before the foundation can begin operations, its funding priorities must be defined by the board. The more focused the priorities, the easier it will be to solicit and evaluate applications, target funds, and monitor activities to ensure that the priorities are being met. The board of directors, with the help of the executive director, thus should produce detailed funding priority statements, subject to modification in the light of experience. Sampling of class members' opinions and direct contacts with members of the class would help the board ascertain class members' views. See Special Master's Report, pp. 217-20. The board itself, however, will take full responsibility for making the hard decisions necessary to operate the foundation.

2. Grant Application and Review Process

The board of directors should be prepared to initiate a funding process as soon as possible after its members have been appointed by the court. The board will be *1442 required to submit a plan for foundation operations to the court within eight months after the appointment of its members. See infra Part VII.C.2. In developing procedures for soliciting and reviewing grant applications, the board should consider the following guidelines.
(a) Open and Competitive Bidding. The foundation will need to establish the most competitive and efficient system to ensure the best services are obtained for the class. In some cases, the executive director would issue a general request for proposals to allow any group to apply for funding. In other cases, that process might be inefficient and the executive director probably would ensure better services by soliciting proposals from the existing groups providing the service. If there are very few qualified proposals, the executive director should explain why solicitation of additional proposals would not be likely to result in better services.
(b) Review of Bids and Monitoring of Ongoing Projects. The executive director would make the initial review of all grant applications and contract offers and screen out those that do not meet foundation requirements. If necessary, the executive director would refer qualified bids to expert peer review committees for technical and professional evaluation and funding recommendations. The executive director would consider the peer review evaluations and make funding recommendations to the board, which must approve all grants and contracts.
Peer review committees could be established by the board. They would be comprised of experts in various fields relevant to the foundation's mandates. The experts generally would serve without compensation except reimbursement of expenses. Peer review committees could be established for each of the foundation's general project areas. For example, there could be a peer review committee of health professionals for health-related projects.
The executive director also would develop mechanisms for monitoring and evaluating the performance of service suppliers. One such method would be to condition disbursements of funds on receipt of quarterly status reports and an annual accounting and audit. The expert peer review committees also could be enlisted to help in the monitoring and evaluation process.

3. Service Suppliers Represented on the Board of Directors

Representatives of existing veterans organizations and state Agent Orange commissions may serve on the board of directors of the foundation. These representatives are likely to be knowledgeable about Agent Orange and Vietnam veteran issues, and such expertise would be a significant asset for the board. The organizations these board members represent probably will have experience in meeting the needs of Vietnam veterans. Therefore, these organizations probably would be interested in and qualified for funding by the foundation.
Funding proposals from these organizations should be encouraged, but self-dealing must be avoided. Accordingly, certain safeguards must be built into the grant process. Whenever an organization having a representative on the board is recommended for funding by the executive director, full disclosure must be made to the board. In addition, the executive director must fully explain in the recommendation to the board why this organization is the best qualified for funding. The board additionally should develop specific procedural safeguards to ensure fair administration of the foundation. These safeguards would balance the need to encourage existing veterans groups to seek funding from the settlement with the need to eliminate any appearance of impropriety in the funding process.

F. Fundraising

The board of directors should develop fundraising strategies to augment the initial endowment of the class assistance foundation. Money from the initial endowment can be used to initiate fundraising efforts, but such efforts should become self-supporting as quickly as possible. The *1443 prestige and name of the court should not be invoked in any way in fundraising activities. See Canon 5(B)(2) of the Code of Judicial Conduct. No one engaged in fundraising activities should make any reference to the court or any statement that the court endorses or is involved in the solicitation.

1. Matching Grants, Joint Ventures and Similar Devices

The objective of the foundation is to have as great an impact as possible on problems facing the class. The board and executive director should develop ways to increase the leverage of foundation funding and thus maximize the reach of this program. Grants could be conditioned on the grantee obtaining matching grants from other sources. Cooperative projects funded jointly by the class assistance foundation and other foundations, organizations or industry could be developed. One-time seed money grants could be used to encourage the creation of new institutions to help the class.

2. Charitable Contributions

The board of directors should seek private donations to augment the foundation's initial endowment from the settlement fund. As discussed supra Part V.B.1, in establishing the not-for-profit organization that will govern the foundation, tax-exempt status will be sought, to enable the foundation to obtain individual and corporate charitable contributions. The board should look to these private sources of funds as a way to multiply the beneficial impact of the settlement fund on the class.
Because private donations are outside the scope of the settlement agreement, any additions to the original endowment gained through fundraising would not be subject to the jurisdiction of the court or the strictures of the settlement agreement.

VI. AUSTRALIAN AND NEW ZEALAND CLAIMANTS
The settlement includes the claims of Australian and New Zealand veterans and their family members as well as those of United States class members. Arguably, because the settlement agreement did not distinguish foreign class members from their American counterparts, Australian and New Zealand claimants should be treated no differently in distributing the settlement fund. Under this view, these class members would submit applications for payment to the payment program and seek services from the class assistance foundation just as would American class members.
But the service needs and desires of the foreign claimants and the availability of government and private services in those countries may differ greatly from the situation of class members in the United States. Both countries, for example, apparently have more extensive publicly funded health and medical programs than does the United States. An effort should be made to fund projects tailored to the needs of the Australian and New Zealand claimants.
The only practical way of accomplishing this goal is to turn over a portion of the fund to a single organization in Australia and one in New Zealand, to be administered as a trust on behalf of class members in those countries. A single trust institution could be created for Australian and New Zealand class members, or two could be established, one in each country. Such an organization must be established by the government and class members in each country working cooperatively. The court lacks the resources and requisite familiarity with foreign legal, political, social and economic systems to create an umbrella entity on its own. The trust fund framework, however, must be set up with some degree of consensus. Approval will not be given to a proposal that simply would entrust the funds to one of a number of competing veterans organizations.
The distribution plan adopted by the trust, though subject to court approval, may be completely independent of the plan set out in this opinion. Alternatives rejected here may be practical overseas because of differing circumstances. Any reasonable distribution plan will be permitted. *1444 The Special Master will be available for consultation on the creation of a trust institution and formulation of a distribution plan.
If no satisfactory umbrella administrative proposal is forthcoming for a given country, the funds allocable to that nation's claimants will not be administered separately. Such claimants will participate in the payment program and the services funded by the class assistance foundation on the same basis as claimants in the United States. See supra Parts IV and V.
Because the needs of foreign class members and the legal and institutional mechanisms required to meet those needs may differ from those of United States class members, a representative of these foreign class members would be consulted by the foundation's board of directors and the payment program advisory group. The representative should be familiar with the veteran community in his or her country as well as the government and private services available to veterans and their families.
If an umbrella administrative plan is approved by the court, funds will be allocated in proportion to the number of Vietnam veterans from that country. According to figures provided by the United States Department of Justice, of the total number of Vietnam veterans who served with the United States, Australian and New Zealand armed forces, 2,595,200 were from the United States, 48,400 from Australia, and 3,842 from New Zealand. See Letter from Arvin Maskin, Trial Attorney, Torts Branch, Civil Division, United States Department of Justice, dated March 29, 1985. Foreign veterans from these two allies constitute about 2 percent of the total. Rounding off the figures, 1.8 percent of the settlement fund would be allocated to Australia and 0.2 percent to New Zealand. Of the $200 million that will be available, $4 million thus would be set aside, $3.6 million for Australia and $400,000 for New Zealand.
A preliminary trust plan has been submitted for administering the funds allocable to Australian class members. See Draft Memorandum and Articles of Association of Australian Vietnam War Veterans Trust Limited, filed March 25, 1985; Letter from Joseph F. Kelly, Jr. dated March 21, 1985, filed March 25, 1985; Letter from Joseph Kelly, Jr. dated April 5, 1985, filed April 10, 1985. The plan apparently has the support of the Australian government and two major Australian veterans' groupsthe Vietnam Veterans Association of Australia and the Returned Services League of Australia. The Australian government took an active role in resolving differences among interested parties and in ensuring that a single plan was submitted for administration of the Australian funds.
Mr. A.T. Gietzelt, Australian Minister for Veterans' Affairs, has informed the court that the Honorable Mr. Justice Leycester Meares, formerly of the Supreme Court of New South Wales, has agreed to be chairman of the trust. The board of trustees would be composed of the chairman, appointed by the Australian Minister of Veterans' Affairs, two members appointed by the VVAA, two appointed by the RSL, one appointed by the Australian Veterans and Defence Services Council, and one appointed by Legacy Coordinating Council, an organization concerned with the care of the surviving spouses and dependents of veterans. None of the trustees will be paid for their services except for out-of-pocket expenses. The trust will be incorporated as a tax-exempt organization. It also will be able to draw on the administrative resources of the participating organizations, thereby minimizing administrative costs.
The preliminary proposal for an Australian trust fund is under consideration. The organizational framework should be finalized and a distribution plan submitted by October 1, 1985. The Special Master will be available for consultation.
The court has received a number of submissions from counsel and veterans' organizations in New Zealand. The New Zealand government appears to be willing to oversee the establishment of a trust in which the various New Zealand veterans groups would participate, taking a role similar to that of the Australian government *1445 regarding an Australian trust fund. As yet, however, the court has not received a confirmation from the New Zealand government of its willingness to oversee the formulation and submission of a trust proposal as well as the implementation of such a plan once approved by the court. It would be desirable for the chairman of any such trust to be appointed by the New Zealand Minister in Charge of War Pensions or by some other government official, and for the New Zealand government to confirm to the court that any trust proposal submitted has the support of veterans groups such as the New Zealand Returned Services Association, the New Zealand Ex-Vietnam Services Association, and the New Zealand Vietnam Veterans Association. The specific terms of the trust would depend on the provisions of New Zealand domestic law.
No comprehensive proposal for administration of funds in New Zealand has yet been received. No framework for separate distribution can be approved at this time. Further submissions must be received by September 1, 1985. The Special Master is requested to assist interested parties including the New Zealand government in formulating and forwarding an administrative proposal. If a satisfactory plan is not forthcoming by September 1, 1985, New Zealand claims will be handled under the distribution plan outlined in this opinion.

VII. IMPLEMENTATION AND OPERATION OF THE DISTRIBUTION PLAN
Until the appellate process has concluded, no disbursements can be made from the settlement fund, either as individual awards from the payment program or as grants and contracts from the class assistance foundation. Nevertheless, while appeals are pending all necessary preliminary steps can and should be taken to render the distribution plan as close to fully operational as possible. These interim organizational efforts will permit the benefits of the settlement to reach the class in a uniform and expeditious manner.

A. Communications with the Class

Effective implementation of the distribution plan will require continuing efforts to inform class members about the settlement, the benefits available from the payment program and the services funded by the class assistance foundation. Because the foundation will be the more permanent institution, funding services with classwide impact across the country, it will bear primary responsibility for informing the class.
Further information also must be collected from the claimantsthose class members who have expressed an interest in participating in the settlement by filing a claim form. Because these communications for the most part will relate to the implementation of the payment program, the payment program will bear primary responsibility for collecting more information from claimants.
Insofar as possible, classwide notices should be coordinated to reduce the drain on settlement funds.

1. Publication of the Terms of the Plan

Even though no subsequent claims for persons who died or became totally disabled more than 120 days ago will be considered timely filed without further order of the court, efforts to encourage participation of class members in the settlement must continue. Veterans and their families must be made aware of the fact that claims still can be filed for deaths and total disabilities that occur in the futuremeasured from 120 days before issuance of this opinion. In addition, class members who have yet to file claim forms must be informed of the details of the distribution plan so that they can take advantage of services that will be funded by the class assistance foundation.
Particular emphasis should be placed on efforts to communicate with class members who are outside the mainstream of society. Special efforts of this kind were made in distributing notices of settlement with claim forms to the class. The cooperation of the governors of the states and the *1446 Federal Bureau of Prisons was solicited in reaching incarcerated veterans. Claim forms were forwarded to veterans groups and Hispanic and black organizations for copying and distribution. Information was provided to members of Congress for dissemination. These and similar endeavors must continue to ensure an effective distribution of the settlement fund. Special steps must be taken to reach incarcerated veterans, those facing language barriers, those who live in rural areas or on Indian reservations, and those who are isolated from their communities. See also supra Part V.A.3. For example, informational mailings and payment application forms should be translated into Spanish and copies of the translations be made available to Hispanic veterans groups and other organizations.
Various groups can be called on to help inform the class about the provisions of the distribution plan. These groups, moreover, may provide ideas on how best to serve the Vietnam veteran community. Permanent relationships should be established between the class assistance foundation and groups such as the following: existing veterans organizations and nonprofit veteran service organizations; state government agencies, particularly departments of veterans affairs and state Agent Orange commissions; federal government agencies, including the Bureau of Indian Affairs, the Federal Bureau of Prisons and Veterans Administration facilities, including vet centers; governors of each state and local elected officials; members of Congress; community, social, fraternal and ethnic organizations; and broadcast and print media, through public service messages and public affairs programming.
Notice of the terms of the distribution plan will be provided to those who have already filed claim forms in the coordinated mailing to all claimants. See infra Parts VII.A.3 and VII.A.4. The notice will outline the eligibility criteria for the payment program, discuss the range of services that might be funded by the class assistance foundation, and list telephone numbers and addresses that the claimant can use to obtain further information about these programs and services.
Afterborn children or their guardians who file claims must be informed about the settlement agreement's provision that an afterborn child's election to accept benefits from the settlement fund waives any right to sue the defendants for any claim arising out of the subject matter of this litigation that is, a claim alleging harm caused by exposure of a parent to Agent Orange in or near Vietnam. A statement to this effect therefore will be included with the application forms that will be sent to all claimants. Afterborn children who later seek foundation-funded services should be notified of this provision as well.

2. Periodic Notice About the Operation of the Plan

Information about the operation of the distribution plan will be distributed periodically to award recipients through the payment program, and to other class members through the communications network and other means available to the class assistance foundation. Provision of such information to the class is important. The funding of service programs by the foundation would be frustrated if class members did not know that the services were available.
A periodic notice could report jointly on payment program and class assistance foundation operations. It should inform the class of any changes in the eligibility criteria for the payment program and outline services funded by the foundation. It should include information on foundation board meetings and court proceedings concerning the distribution plan.
Existing veterans groups regularly communicate with the Vietnam veteran community. Those responsible for developing and distributing the periodic notice should consult these groups to determine the most effective and cost-efficient method of disseminating information to the class.

3. Mailings to Prospective Payment Program Claimants

Implementation of the distribution plan, particularly the payment program, will require *1447 more information to be obtained from claimants. Collection of this information will be given priority. Specific payment program compensation levels, exposure parameters, and the relative weight given to various eligibility criteria all will depend on the data to be submitted by claimants. Information collection thus must begin as soon as appropriate forms can be developed.
The Special Master will initiate development of payment application forms with the assistance of consultants. The forms should be simple and easy to understand, so that they can be filled out by class members with a minimum of legal or other assistance. Because of the high cost of communicating with such a large group, the application forms should be comprehensive so that one mailing will elicit all the information needed. So far as possible, the forms should be designed for computer coding and perhaps optical scanning to facilitate processing. Comprehensive payment application forms will include at least two formsan exposure questionnaire and an application for payment.
The exposure questionnaire will solicit detailed information on exposure to Agent Orange. See supra Part IV.D. Anyone wishing to participate in the payment program must complete this questionnaire. The class assistance foundation may limit certain services based on exposure, or fund a program providing individual exposure assessments. See supra Part V.A.3. Claimants wishing to take advantage of services that will be funded by the foundation therefore may be required in the future to complete and return the exposure questionnaire.
The application for payment must be completed and returned by claimants who wish to be considered for cash compensation from the payment program. The application form will instruct the claimant to include medical documentation regarding the death or disability, and will request the claimant to sign a privacy waiver that will allow access to the veteran's military and medical records. Only spouses or children of deceased veterans, and those veterans who believe they suffer long-term total disabilities, should complete the application for payment. Claims for death or disability from traumatic, accidental, or self-inflicted causes will not be eligible for cash compensation. See supra Part IV.A.
In completing the exposure questionnaire and the application for payment, claimants will be made aware that they are submitting information to a court-supervised entity and that they may be subject to penalties for supplying false information. The filing of a false claim in a class action in federal court is a serious federal crime. See 18 U.S.C. §§ 2, 371, 1341. As a safeguard against fraud, each claimant will sign under penalty of prosecution for perjury a statement that the information supplied in the exposure questionnaire and the application for payment is true to the best of the claimant's knowledge.

4. Coordinated Mailings by the Class Assistance Foundation

The foundation board of directors probably will need information to help establish specific funding priorities. See supra Part V.E.1. If the board develops a services survey and a birth defects questionnaire, efforts will be made to coordinate the mailing of the board's information request with the mailing of the court-approved payment program forms. Such coordination will reduce the cost of data collection. It may increase the response rate as well, since claimants will be solicited only once for detailed information.

5. Assistance for Claimants in Filling Out Forms

Claimants are likely to have questions about the forms and may need help in completing them. Methods should be developed to aid claimants in completing the application forms. Such assistance will involve some initial expense, but it will increase the completeness and accuracy of the data submitted. Provision of assistance thus will help assure that qualified claimants get the benefits for which they are eligible, and will reduce processing and evaluation costs for the settlement fund. *1448 Understandable, step-by-step instructions will do much to eliminate confusion and ensure accurate data collection.
A toll-free telephone number will be provided for claimants who need further assistance. This service will be staffed by trained people who can answer questions about the application forms. Sufficient telephone lines should be used so that claimants can get through to operators without undue delay. Because the toll-free number is likely to be very busy at times, arrangements will be made for an answering tape with basic information and referral numbers to aid callers, who then can wait for the first available operator if the tape does not provide sufficient information.
The existing national network of veteran service representatives also should be utilized. These service representatives, usually employed by state veteran affairs departments, already help veterans complete information requests from government agencies. A training manual will be developed on how to complete the Agent Orange application forms. This manual will be distributed to all service representatives and to other government agencies, and private organizations that regularly counsel Vietnam veterans. In addition, a series of briefing sessions should be scheduled around the country to inform interested representatives about how to complete the application forms.
The combination of clear instructions, a toll-free telephone number and a network of trained service representatives should eliminate much of the confusion involved in seeking detailed information from such a large, diverse group. In addition, any other cost-effective means to assist claimants in completing the application forms will be explored.

B. Overall Structure and Financial Matters

1. Minimizing Adverse Tax Consequences

An important objective of the distribution plan is to maximize the amounts available for disposition. Because the settlement fund will be invested and disbursed over a period of many years, it is important to minimize the negative impact of federal, state and local income taxes on the earnings and gains realized by the fund. Another important goal is to ensure that payment program awards and class assistance foundation grants are exempt from taxation.
Adverse tax consequences will be minimized by seeking an Internal Revenue Service ruling of tax exemption under section 501(c)(3) of the Internal Revenue Code of 1954, as amended, as a charitable organization that serves a public purpose.
Awards from the payment program should be treated as exempt from tax. See, e.g., I.R.C. § 104(a)(2) (tort recoveries are not "income"). Similarly, indirect benefits received by class members from the foundation should be designed in a way to avoid being treated as taxable income.

2. Investment

Among the most important responsibilities in administering the settlement programs are protecting and managing the assets of the settlement fund. The principal decision that must be made is the selection of an investment manager or investment managers who will be responsible for investing the fund. The court will make this selection after consulting Special Master Feinberg, the Special Master for Investment Policy, Richard J. Davis, the foundation board of directors and the payment program advisory group.
Special Master Davis has already commenced the process of identifying capable and interested investment managers. See Special Master's Report, pp. 599-618. On February 1, 1985, Special Master Davis sent a detailed request for further information to a number of investment managers who previously had indicated an interest in managing the fund. This request for information asked the investment managers to describe how they would propose to invest the assets of the fund. The request for information also asked a series of questions about the financial institution's experience, *1449 performance, ability to adjust investment strategy, and other matters related to the institution's ability to provide service to the fund. In addition, questions were asked about the institution's costs and fees.
Based on the written submissions in response to the questionnaire, Special Master Davis has indicated that he expects to select between four and six finalists. In coordination with Special Master Feinberg, Special Master Davis will interview the finalists, and consult with the payment program advisory group and the foundation board of directors with respect to the interviews. After the interviews, the Special Masters will recommend an investment manager or investment managers to the court. The court will approve or disapprove the selection after consulting the payment program advisory group and foundation board of directors. It may well be desirable to set up the payment program disbursing agency in the form of an insurance company with power to invest the program's $150 million fund. If so, adequate protection of the fund's security will need to be provided.
As noted supra Part V.C, once the distribution plan is fully operational, the class assistance foundation's endowment will be transferred to it. The board will make all subsequent investment decisions. If the board at any time decides to change investment managers, it will give advance notice in writing to the court before acting.
Investment strategy for both distribution programs should be guided by considerations of security, return on investment and flexibility. Those responsible for investment decisions should keep in mind that the assets of the fund belong to the class, and are being administered for the benefit of the members of the class. Adequate bonding, auditing and insurance will be required.

3. Administrative Budgets

The payment program and the class assistance foundation will be operated as efficiently and economically as possible. Administrative costs must be minimized so that members of the class receive the largest possible benefits of the settlement.
Most payment program expenses will be incurred in the early years when the largest influx of application forms will occur. The cost of administering the payment program should dwindle in the later years of the program.
In contrast, the cost of administering the class assistance foundation will be relatively constant throughout the entire 25 years of its operation under the distribution plan. Control of the foundation's administrative expenses, like other aspects of administering the foundation, will be the responsibility of the board of directors and the executive director.
Because of uncertainties associated with both distribution programs, it is difficult to project the cost of administering them. Until more is known about the claims that will be submitted to the payment program, the size of the tasks that will have to be performed cannot be projected with precision. In addition, many tasks would be contracted to outside service providers. These services would be subject to a competitive bid process. See supra Part IV. H.1. The foundation's administrative expenses will depend on what the board of directors determines the foundation should do. At least some of the services it funds might also be subject to competitive bidding. See supra Part V.E.2.a. The Special Master's Report provides some tentative and preliminary cost projections. See Special Master's Report, pp. 619-23.

4. Audits

Throughout the life of the distribution programs, one or more accounting firms will conduct an independent audit at least annually of all aspects of the programs, including investment of the settlement fund, operation of the payment program, and operation of the class assistance foundation. The board of directors will select the accounting firm that will conduct future independent audits of the foundation. The court may require further independent *1450 audits of the foundation by a court-appointed accounting firm.
Audits will include a review of financial transactions to determine whether the financial reports fairly represent the current financial position of the programs and changes in that financial position. They also will include an analysis of whether the distribution programs are operating in an efficient, economical and effective manner. Reviews will encompass the operations of the major contractors and the investment program, as well as the distribution programs. The reports will be submitted to the court and will be docketed as part of the court record, where they will be available to class members and to the public.

C. Role of the Special Master and Implementation Schedules

The Special Master will have an important role in readying the distribution plan for implementation. Accordingly, Special Master Kenneth R. Feinberg's appointment as Special Master will continue on a contract basis until such time as the distribution plan has been implemented and is fully operational. Among other things, the Special Master will oversee the planning and development of the payment program. He will consult with the advisory group of Vietnam veterans that will be appointed by the court. See supra Part IV.H.8. The Special Master also will establish the class assistance foundation and seek tax-exempt status for the foundation. See supra Part V.B.1. The foundation board of directors will be consulted.
Establishing an implementation schedule requires a balance to be struck between competing objectives. One of the advantages of a settlement in any lawsuit is that plaintiffs can receive funds sooner and avoid the uncertainty and lengthy delays involved in litigating the case to a final judgment. Development and implementation of a plan for distribution of a settlement fund thus should proceed as expeditiously as possible, so that the plaintiffs can begin to benefit from the settlement. See In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 858 (E.D. N.Y.1984).
Formulation of a fair and equitable distribution plan in this case has required careful and extended consideration of numerous distribution proposals and resolution of many complex and difficult issues. Haste in establishing the $200 million programs called for in the court's distribution plan could be expensive to the class, wasting funds that could otherwise be expended for the benefit of class members. Prompt but prudent action is the wisest course in making the payment program and class assistance foundation operational. The desirability of distributing the benefits of the settlement to the class as soon as possible cannot be allowed to obscure the equally important objective of operating the distribution programs in an efficient, professional and cost-effective manner.
The Special Master recommended that the payment program and class assistance foundation be made operational within a reasonably short period of timea year from the date of this opinion, if possible. Special Master's Report, p. 242. This target date is desirable and acceptable. All permissible preliminary steps toward making the distribution programs operational will be undertaken while appeals are pending so that delay in implementation is minimized. It is important to recognize, however, that because of the appellate process a definitive time schedule for implementation and the beginning of distribution operations cannot be fixed.
With these limitations in mind, the following schedule will govern implementation of the distribution plan. It is based on sample schedules prepared by the Special Master. See Special Master's Report, pp. 591-98. The schedule incorporates the dual objectives of operating the settlement programs efficiently and professionally while distributing settlement benefits as expeditiously as possible. The dates used are not precise deadlines. They are set forth to demonstrate the tasks that need to be accomplished and to provide estimates of how long it should take to complete them.

*1451 1. Payment Program

The Special Master will immediately begin to assemble a detailed bid request to be sent to prospective contractors desiring to provide claim processing services. By June 30, 1985, the court will appoint a veterans advisory group. See supra Part IV.H.8. By August 1, 1985, a claim processor or claims processors should be selected. See supra Part IV.H.1.
From August 1, 1985 through December 1, 1985, application forms and instructions should be prepared, approved by the court, and printed. An assistance manual should be prepared and disseminated to state veterans agencies and to veterans organizations. See supra Parts IV.H.2, IV.H.3 and VII.A.3.
By December 1, 1985, application forms will begin to be sent to claimants. Claimants will have 60 days from the date of mailing to complete and return the forms. Completed forms will be returned by March 1, 1986. See supra Parts IV.H.3 and VII.A.3. From January 1, 1986 through May 1, 1986, the returned claims will be analyzed and additional information needed in processing any of them obtained. Eligibility criteria and payment levels will be evaluated. By May 31, 1986, a report should be submitted to the court on final eligibility proposals and projected payment levels. By June 15, 1986, the court should approve final eligibility and disability criteria and first payment levels. See supra Part IV.H.5.
Beginning on June 15, 1986, claims should be processed based on approved eligibility and disability criteria. By July 1, 1986, assuming that implementation has proceeded on schedule and all appeals have been completed, the first payments will begin going to qualified applicants. See supra Part IV.H.4.

2. Class Assistance Foundation

By June 30, 1985, the court will appoint a search committee comprised of prospective members of the foundation board of directors. The committee will seek and evaluate candidates for executive director of the foundation. See supra Part V.B.3.
By August 1, 1985, the Special Master should establish the foundation, and the court should appoint the board of directors and the executive director. See supra Part V.B. The board should submit a comprehensive plan for foundation operations to the court by April 1, 1986. Payments by the foundation can begin by May 1, 1986 if all appeals have been completed.

3. Annual Operating Schedules

Once implemented, the distribution programs will operate on regular annual schedules. Sample schedules are set out in the Special Master's Report. See Special Master's Report, pp. 594, 597-98.

VIII. CONCLUSION
The settlement fund will be distributed according to the plan set forth in this opinion. Distribution of the fund is stayed pending completion of appeals. No cash payments to individual claimants can be made and no services can be funded until the appellate process has concluded. During the interim, subject to control by the court, the Special Master will solicit bids from contractors for the payment program, enter into contracts conditioned upon the outcome of the appellate process, establish the foundation and apply for tax-exempt status, develop and mail out payment applications, analyze the returned data, and adjust payment and eligibility criteria.
Necessary and incidental expenses of administering the settlement fund in these and other respects will be paid on court order out of the settlement fund. Contracts entered into, to the extent of performance prior to any appellate decision, and payments made pursuant to court approval, shall be valid whatever the ultimate outcome of any appeals.
SO ORDERED.